COURT OF APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH
 
NO. 2-01-206-CV
 
  
ROBERT GROSS, M.D.,                                                        APPELLANTS
ALL SAINTS INTEGRATED
AFFILIATES D/B/A ALL SAINTS
MEDICAL ASSOCIATES, AND
STEPHANIE PERDUE, M.D.
  
V.
  
ALYSSHA AND KEITH BURT,                                                   APPELLEES
INDIVIDUALLY AND AS NEXT
FRIENDS FOR HUNTER AND
TYLER BURT, MINOR CHILDREN
  
  
------------
 
FROM THE 342ND 
DISTRICT COURT OF TARRANT COUNTY
 
------------
 
OPINION ON REHEARING
 
------------
        After 
reconsidering our prior opinion on appellees’ motions for rehearing and 
motions for rehearing en banc, we deny the motions for rehearing and rehearing 
en banc,[1] withdraw our February 26, 2004 opinion and 
judgment, and substitute the following in their place.
        A 
jury found several defendants negligent in this medical malpractice case 
regarding their failure to treat and diagnose twin premature infants for 
retinopathy of prematurity, which resulted in permanent injury and partial 
blindness for the twins. The appellees, Alyssha and Keith Burt, asserted claims 
in their individual capacities and on behalf of their two sons, Hunter and 
Tyler. They asserted claims against Robert Gross, M.D., a pediatric 
ophthalmologist, Stephanie Perdue, M.D. and Wayne Yee, M.D., both pediatricians, 
All Saints Integrated Affiliates d/b/a/ All Saints Medical Associates (All 
Saints), Dr. Perdue’s employer, and Harris Methodist Texas Health Plan, Inc. 
d/b/a Harris Methodist Star Health Plan (the Plan).  Prior to trial, the 
trial court granted Dr. Gross’s motion for summary judgment as to the Burts’ 
claims with respect to Tyler based upon the lack of a physician-patient 
relationship.  The Burts’ remaining claims proceeded to trial.  The 
jury returned a verdict against all of the defendants except the Plan.  The 
Burts settled with Dr. Yee. Dr. Gross, Dr. Purdue, and All Saints 
appealed.  This appeal follows.  We reverse the trial court’s 
judgment and render judgment against the Burts on all of their claims against 
Dr. Gross, Dr. Perdue, and All Saints.
Factual Summary
        Hunter 
and Tyler were born prematurely on December 26, 1996 at Harris Methodist 
Hospital (Harris). They both required ventilation and some oxygenation and 
remained in Harris’s neonatal intensive care unit (NICU) until February 
1997.  At birth, Tyler weighed three pounds one ounce and Hunter weighed 
two pounds nine ounces.  They both required intravenous feeding and were 
diagnosed with apnea of prematurity, bradycardia of prematurity, and neonatal 
jaundice.  Hunter also had an inguinal hernia.  Further, because of 
his weight and prematurity, Hunter was potentially at risk for retinopathy of 
prematurity (ROP), which can result in retinal scarring, retinal detachment, 
vision loss, and even blindness. Babies at risk of ROP require serial screening.
        In 
the NICU, Tyler was identified as Twin A and Hunter as Twin B. Medical records 
reflected their mother was Alyssha Taylor and their father was Keith Burt. Both 
twins were given the last name of Taylor at Harris.[2]
        Dr. 
Kim Smith, a neonatologist, was the admitting and attending physician for the 
twins while they remained in the NICU. The attending neonatologist determines 
whether a premature baby needs to be screened for ROP. Harris’s Level III NICU 
has an ROP screening protocol, and when a premature infant meets the 
protocol’s criteria, that infant’s name is placed on one of the consulting 
ophthalmologists’ examining lists. The actual screening is performed by a 
pediatric ophthalmologist. At the Harris NICU, the pediatric ophthalmologist is 
a consulting physician requested or ordered by the attending physician, who 
reports back to the attending physician. Thus, Dr. Smith ordered a screening ROP 
examination for Hunter because he met hospital protocol for screening due to his 
birth weight and gestational age of twenty-nine months. Tyler did not fall 
within the NICU’s parameters, so Dr. Smith did not order an initial ROP 
screening test on him. On Dr. Smith’s order, Dr. Gross, who was a consulting 
pediatric ophthalmologist for the NICU, performed a preliminary screening 
examination on Hunter on February 8, 1997. Hunter was identified by Dr. Smith as 
Twin B at the time Dr. Gross performed the screening tests.
        Dr. 
Gross determined that Hunter had Stage I ROP in his right eye. He forwarded an 
ROP “Initial Evaluation” report of his findings and recommendations back to 
Dr. Smith and recommended that Hunter seek a follow-up visit within two weeks. 
Prior to Hunter’s evaluation in the NICU, the Harris NICU nurses helped 
Alyssha make eye appointments for both twins at Dr. Gross’s office for 
February 17, after their discharge. Alyssha used the names Hunter and Tyler Burt 
when she made the February 17, 1997 appointments.
        Tyler, 
Twin A, was discharged from the NICU on February 5, 1997, and Hunter, Twin B, 
was discharged on February 13, 1997, before their scheduled February 17 
appointments with Dr. Gross. Dr. Smith testified that the parents had been 
sufficiently educated about ROP by the time of the babies’ discharges. Jerri 
Ballard, a Harris NICU nurse, testified that in her opinion both of the parents 
were taught the importance and relevance of the follow-up ROP appointments in 
order to be discharged from the NICU.
        Upon 
discharge, Alyssha selected Dr. Wayne Yee, a pediatrician, to become the 
babies’ primary care physician. Dr. Yee examined Tyler on February 12, 1997, 
and his external eye exam was normal. He confirmed Alyssha’s appointments for 
both twins with Dr. Gross for the 17th. Dr. Yee testified that he discussed with 
the Burts the importance of making the appointments for the ROP exams.[3] A doctor-to-doctor letter from Dr. Smith to Dr. Yee 
specifically identified Hunter’s ROP diagnosis and showed that both twins had 
set up appointments with Dr. Gross for February 17.  Hunter’s appointment 
with Dr. Gross was “starred,” as was his ROP diagnosis.
        The 
NICU also confirmed the twins’ appointments with Dr. Gross for February 17, 
1997. Alyssha and Keith were informed of the importance of the follow-up 
appointments for ROP. However, Alyssha did not take the twins to this 
appointment because she had no referral. Records at Dr. Yee’s office show that 
Alyssha requested a referral from Dr. Yee to Dr. Gross on February 17, the 
actual day of their appointment. Dr. Yee completed the referral on February 19.
        Alyssha 
rescheduled the appointment for February 28, 1997; however, they missed this 
appointment too. In the interim, both twins had been admitted to Cook 
Children’s Hospital (Cook’s) on February 24 due to a virus. Hunter was 
released from Cook's on February 28 and Tyler was released on March 1. Alyssha 
never called to cancel the February 28 appointment or to reschedule it. Dr. Yee 
testified that he had instructed Alyssha to postpone the February 28 appointment 
since one or both twins were about to get out of the hospital.
        As 
of March 1, Alyssha and Keith had become dissatisfied with Dr. Yee.  At the 
same time, Alyssha knew they had missed two appointments with Dr. Gross.  
On or about March 6, 1997, the parents terminated Dr. Yee’s services and 
switched to Dr. Stephanie Perdue as their new pediatrician. Except for 
Hunter’s February 8 examination by Dr. Gross, Hunter and Tyler did not see a 
pediatric ophthalmologist until June 1997 when they were diagnosed as being 
legally blind.
        After 
trial but before the jury’s verdict came in, Dr. Yee settled with the Burts 
for $7.5 million. The jury found all three doctors negligent, as well as All 
Saints. They found Dr. Yee liable for 50% and 60% of the damages to Hunter and 
Tyler, respectively; Dr. Perdue liable for 30% and 35%, respectively; Dr. Gross 
liable for 15% of Hunter’s damages; and the parents liable for 5% of the 
twins’ damages. The jury awarded no punitive damages against any defendant and 
found that the Plan was not liable at all. Pursuant to the settlement, the Burts 
dismissed their claims against Dr. Yee. The trial court entered a judgment 
against Dr. Gross, Dr. Perdue, and All Saints accordingly.
Issues Relative to Dr. Gross’s Appeal
        In 
five issues, Dr. Gross challenges the judgment rendered against him. In his 
first issue, he challenges the legal and factual sufficiency of the evidence to 
support the jury’s finding that his negligence caused any harm to Hunter. In 
his second issue, Dr. Gross challenges the trial court’s rulings on several 
evidentiary issues including: the trial court’s refusal to allow Dr. Gross to 
introduce evidence of nystagmus as an alternate theory of causation; the trial 
court’s refusal to strike Dr. Don Schaffer’s testimony that Dr. Gross was 
negligent; and the trial court’s prohibiting Dr. Gross from offering an 
explanation of Hunter’s name change from Taylor to Burt. In his third issue, 
Dr. Gross contends Alyssha and Keith cannot recover mental anguish damages 
because such alleged damages were not a contemporaneous result of Hunter’s 
injuries. In his fourth issue, Dr. Gross challenges the legal and factual 
sufficiency of the evidence to support the various amounts the jury awarded 
Hunter. In his fifth issue, Dr. Gross challenges the Burts’ right to an award 
of prejudgment interest on future damages.[4]
Facts Relative to Dr. Gross
        When 
Hunter was added to Dr. Gross’s screening list at the NICU, Dr. Gross 
performed an initial examination. The only information or record Dr. Gross 
maintained on Hunter was the one-page examination sheet he completed and the 
registration information the hospital had provided him. While it showed the 
parents' names as Alyssha Taylor and Keith Burt, the twins' last name was shown 
as Taylor. Dr. Gross did not know that Alyssha and Keith had changed the 
twins’ last name to Burt until after they had instigated litigation.
        Before 
beginning his examination of Hunter at the NICU, Dr. Gross reviewed Hunter’s 
NICU chart to look for any other infections or systemic issues that might 
potentially affect the child’s eyes. He verified the charted problems and that 
the name on the chart matched the name on the bassinet and the patient. He also 
checked the date of birth, birth weight, and gestational age at birth, and 
whether it was a multiple birth. When Dr. Gross saw Hunter on February 8, the 
NICU nurses had charted his gestational age as 30 weeks. Dr. Gross noted his 
birth weight of 1170 grams.
        When 
he completed Hunter’s exam, he prepared an initial ROP report that showed his 
findings indicating stage I ROP in Hunter’s right eye. This report showed 
Hunter’s date of birth, gestational age, and birth weight and recommended a 
follow-up visit in two weeks. The report was made on a Harris form listing 
Alyssha Taylor and Douglas Burt[5] as parents.  
It was charted with the name “Hunter Taylor ‘B’“ and dated February 8, 
the day of the exam.
        Dr. 
Gross testified that it was very common for him to see only one of a group of 
twins or triplets. He also testified that he knew at trial that the hospital had 
scheduled both twins' appointments with him for February 17, but that he did not 
know it at the time. At Alyssha’s request, his office rescheduled appointments 
for February 28. The twins missed that set of appointments too because they had 
been admitted to Cook’s on February 24 and had both been discharged by March 
1, 1997, but no one advised Dr. Gross or his office of this or requested that he 
see either of them at Cook’s instead. Dr. Gross never examined Tyler and 
Hunter after the February 8 in-hospital exam of Hunter.
        Sometime 
later in February, Dr. Gross’s office received the twins’ referrals from Dr. 
Yee, which indicated a tentative diagnosis of ROP. When asked why his office did 
not track them down, Dr. Gross said that any patient who made appointments and 
rescheduled, but did not call to cancel the second appointment, was not tracked 
down by his office. He said it was unethical to run down patients who were “no 
shows” or indicated they did not desire to be treated at his office by virtue 
of their cancellations. According to Dr. Gross, if an existing patient missed an 
appointment, the patient received a notice from his office, but the office does 
not send out notices to new patients. Only if the referring doctor had sent the 
new patient to Dr. Gross with a request for results would he have notified the 
referring doctor that his or her patient had not showed.
Discussion of Dr. Gross’s First Issue
        Dr. 
Gross challenges the jury’s finding that his negligence contributed to 
Hunter’s injuries. This issue is based on Dr. Gross’s assertions that 1) his 
limited physician-patient relationship with Hunter terminated upon completion of 
the initial screening for ROP; 2) he never established a physician-patient 
relationship with anyone named Hunter “Burt”; 3) he never acted negligently 
toward Hunter; and 4) no conduct of his proximately caused any injury to Hunter, 
Alyssha, or Keith, according to proper standards of reasonable medical 
probability.
Legal and Factual Sufficiency Standards of Review
        In 
determining a “no-evidence” issue, we are to consider only the evidence and 
inferences that tend to support the finding and disregard all evidence and 
inferences to the contrary. Bradford v. Vento, 48 S.W.3d 749, 754 (Tex. 
2001); Cont’l Coffee Prods. Co. v. Cazarez, 937 S.W.2d 444, 450 (Tex. 
1996); In re King's Estate, 150 Tex. 662, 244 S.W.2d 660, 661 (1951). 
Anything more than a scintilla of evidence is legally sufficient to support the 
finding. Cazarez, 937 S.W.2d at 450; Leitch v. Hornsby, 935 S.W.2d 
114, 118 (Tex. 1996). More than a scintilla of evidence exists if the evidence 
furnishes some reasonable basis for differing conclusions by reasonable minds 
about the existence of a vital fact. Rocor Int’l, Inc. v. Nat’l Union 
Fire Ins. Co., 77 S.W.3d 253, 262 (Tex. 2002).
        A 
“no-evidence” issue may only be sustained when the record discloses one of 
the following: (1) a complete absence of evidence of a vital fact; (2) the court 
is barred by rules of law or evidence from giving weight to the only evidence 
offered to prove a vital fact; (3) the evidence offered to prove a vital fact is 
no more than a mere scintilla of evidence; or (4) the evidence establishes 
conclusively the opposite of a vital fact. Uniroyal Goodrich Tire Co. v. 
Martinez, 977 S.W.2d 328, 334 (Tex. 1998) (citing Robert W. Calvert, "No 
Evidence" and "Insufficient Evidence" Points of Error, 
38 TEX. L. REV. 
361, 362-63 (1960)), cert. denied, 526 U.S. 1040 (1999).
        When 
we sustain a “no-evidence” issue, it is our duty to render judgment for the 
appellant because that is the judgment the trial court should have rendered. See 
TEX. R. APP. 
P. 43.3; Vista Chevrolet, Inc. v. Lewis, 709 S.W.2d 176, 176 (Tex. 1986) 
(quoting Nat’l Life & Accident Ins. Co. v. Blagg, 438 S.W.2d 905, 
909 (Tex. 1969)).
        An 
assertion that the evidence is “insufficient” to support a fact finding 
means that the evidence supporting the finding is so weak or the evidence to the 
contrary is so overwhelming that the answer should be set aside and a new trial 
ordered. Garza v. Alviar, 395 S.W.2d 821, 823 (Tex. 1965). We are 
required to consider all of the evidence in the case in making this 
determination. Mar. Overseas Corp. v. Ellis, 971 S.W.2d 402, 406-07 
(Tex.), cert. denied, 525 U.S. 1017 (1998).
        Absent 
an objection to the jury charge, the sufficiency of the evidence is reviewed in 
light of the charge submitted. Wal-Mart Stores, Inc. v. Sturges, 52 
S.W.3d 711, 715 (Tex. 2001); see also City of Fort Worth v. Zimlich, 
29 S.W.3d 62, 68-69 (Tex. 2000).
Physician-Patient Relationship
        A 
cause of action based on medical negligence requires a showing of a duty to 
conform to a particular standard of care, a breach of that standard, a resultant 
injury, and a causal connection between the breach of the standard and the 
injury. Majzoub v. Appling, 95 S.W.3d 432, 436 (Tex. App.—Houston [1st 
Dist.] 2002, pet. denied) (op. on reh'g). Duty in a medical malpractice case is 
triggered by the existence of a physician-patient relationship. St. John v. 
Pope, 901 S.W.2d 420, 423 (Tex. 1995). “The question of duty is a question 
of law, which a court must decide before reaching the standard of care.” Majzoub, 
95 S.W.3d at 436. The Majzoub court further held, “If there is no 
prior relationship between the physician and the patient, there must be some 
affirmative action on the part of the physician to treat the patient to create 
such a relationship.” Id. A physician will not be liable for 
malpractice unless the breach of some duty arises from a physician-patient 
relationship. Id.
        Historically, 
Texas courts have required an agreement between the physician and patient or 
some affirmative act on the part of the physician before a legal duty arises. Wax 
v. Johnson, 42 S.W.3d 168, 172-73 (Tex. App.—Houston [1st 
Dist.] 2001, pet. denied). But that relationship may be established with the 
express or implied consent of the physician. Majzoub, 95 S.W.3d at 436. 
“A contract implied in fact ‘arises from the acts and conduct of the 
parties, it being implied from the facts and circumstances that there was a 
mutual intention to contract.’“ Lection v. Dyll, 65 S.W.3d 696, 704 
(Tex. App.—Dallas 2001, pet. denied).
        In 
St. John, our supreme court held, “Creation of the physician-patient 
relationship does not require the formalities of a contract. The fact that a 
physician does not deal directly with a patient does not necessarily preclude 
the existence of a physician-patient relationship.” St. John, 901 
S.W.2d at 424. But, the “on-call” status of a physician does not, without 
more, establish a duty. Id. “Once such a relationship exists, however, 
the physician then owes the patient a duty to treat him or her with the skills 
of a trained, competent professional, and a breach of that duty may give rise to 
a malpractice action.” Reynosa v. Huff, 21 S.W.3d 510, 513 (Tex. 
App.—San Antonio 2000, no pet.). It is the patient’s burden to prove the 
existence of the physician-patient relationship and the resulting existence of a 
duty. Rampel v. Wascher, 845 S.W.2d 918, 921 (Tex. App.—San Antonio 
1992, writ denied).
        In 
this case, Dr. Gross contends that he had no physician-patient relationship with 
a Hunter “Burt” and that any relationship he had with Hunter “Taylor” 
ended when he completed the initial screening ROP exam on February 8, 1997 in 
the NICU and provided Hunter’s attending neonatologist with his report and 
diagnosis. We must determine whether that relationship terminated once Dr. Gross 
reported his findings to the twins’ NICU physician or whether it continued. 
Likewise, we must also decide whether the “Dear Parent” letter described 
below, the Plan, or the scheduled-but-missed appointments created a continuing 
physician-patient relationship between Dr. Gross and Hunter.
Preservation of Error
        The 
dissent contends that the physician-patient relationship issue was not submitted 
to the jury because the parties agreed that the court had determined as a matter 
of law that there was a physician-patient relationship between Dr. Gross and 
Hunter. Dissenting Op. at 2-3. We believe this is a mistaken interpretation of 
the charge conference. The Burts, not Dr. Gross, asked to submit a question as 
to whether Dr. Gross had a physician-patient relationship with Hunter in 
response to Dr. Gross's objection to the submission of the negligence question 
against him.[6]  As we have noted above, it is 
the plaintiff's burden to show the existence of the physician-patient 
relationship before a duty exits. Rampell, 845 S.W.2d at 921. Thus, the 
Burts should have required the very issue the dissent says we should infer 
against Dr. Gross. The court said it best, "Well, to meet the objection 
[Dr. Gross's objection to the submission of his negligence because of 
no-evidence-of-duty by Dr. Gross as to the "care and treatment . . . in the 
office"], you [the Burts] would have to include the issue, correct? . . . . 
To take the objection out of the case, you [the Burts] would have to submit the 
issue and get a positive finding."[7]  Dr. 
Gross's counsel stated that he was not waiving any issue relative to denial of 
the physician-patient relationship on an evidentiary level, i.e., no evidence of 
negligence or proximate cause because of no physician-patient relationship.[8]  His statement that the court had already determined 
there was a physician-patient relationship as a matter of law must be 
based on the court's prior denial of Dr. Gross's motion for summary judgment as 
to Hunter; in that respect the trial court had decided that there was some 
evidence that could support a jury finding of a physician-patient relationship 
at some point in time.
        Dr. 
Gross's post-judgment motions continued to challenge the existence of the 
relationship after Dr. Gross provided his report to Dr. Smith. In Dr. Gross's 
motion for judgment NOV he again asserted no evidence of (a) a physician-patient 
relationship with Hunter, (b) negligence, and (c) proximate cause. Likewise, in 
his motion for new trial he continued to assert his no- evidence challenges. 
Thus, we conclude that Dr. Gross never conceded this issue.
        Additionally, 
the dissent contends we cannot determine whether the physician-patient 
relationship terminated upon Dr. Gross's completion of Hunter's exam and 
reporting of his findings to the neonatologist because Dr. Gross failed to 
submit or request a jury question or instruction on termination of the 
relationship. Dissenting Op. at 3. The dissent bases its contention on rule 279. 
Tex. R. Civ. P. 279. We disagree 
with this application of the rule for two reasons. First, it was the Burts' 
burden to prove the existence of a physician-patient relationship and the 
resulting duty. Second, rule 279 clearly states that a party may assert a legal 
or factual insufficiency challenge for the first time, post-verdict. Id. 
Thus, we believe that although the jury's verdict and resulting judgment may and 
do infer a finding of a physician-patient relationship between Dr. Gross and 
Hunter, Dr. Gross's failure to ask for such a question or instruction does not 
waive his right to challenge that inferred finding on appeal.
The “Dear Parent” Letter
        While 
Dr. Gross contends he had discharged his duty to Hunter by examining him in the 
NICU and reporting the results of the examination to Dr. Smith, the Burts 
contend that the physician-patient relationship continued and Dr. Gross 
consented to further examination and treatment of Hunter, especially in light of 
a letter from Dr. Smith’s office that was either taped to Hunter’s crib in 
the NICU before the first exam or included with his discharge papers. In 
pertinent part, that letter, on Fort Worth Neonatal Associates, P.A. letterhead, 
said:
   
        Dear Parent:
 
An eye examination has been 
scheduled for your baby this week in order to check for the presence of a 
condition known as Retinopathy of Prematurity (ROP); an inflammation of the 
retina—the coating of the inside of the eye that provides our vision. The 
frequency and severity of ROP is primarily related to birth weight and 
prematurity, with babies born very early and with the lowest birth weights 
having the highest risk of experiencing ROP. . . . ROP may advance to the point 
where scarring may occur which may disrupt the vision. . . .
 
. . . . Depending on the 
gestational age of your baby and the findings at the time of the eye 
examination, follow-up visits may be required . . . . These follow-up 
examinations are routine and are necessary due to the fact that ROP may present 
at any time until the retina is mature. You will be contacted by your baby’s 
pediatric ophthalmologist if any significant findings are detected which would 
in any way affect your baby’s health or vision. In specific circumstances, 
your pediatric ophthalmologist may request another ophthalmologist consultant to 
also check your baby’s eyes. Robert D. Gross, M.D., is the Pediatric 
Ophthalmologist who staffs our NICU.
 
. . . . If you have any 
questions, please feel free to ask your nurse or your baby’s doctor.

        The 
Burts contend that the “Dear Parent” letter, coupled with other evidence, 
shows that there was a continuing physician-patient relationship between Hunter 
and Dr. Gross and that Dr. Gross showed his consent to undertake further 
testing. Dr. Smith, Hunter’s neonatologist, testified that, as the primary 
care physician while Hunter was in the NICU, it was his duty to communicate the 
ROP results to Hunter’s parents, and that once he had received Dr. Gross’s 
findings, Dr. Gross’s relationship with Hunter ended. Likewise, Dr. Miles 
Burke, the Burts’ expert, admitted that the primary care physician should 
communicate the ROP results to parents. Also, he agreed that once the twins left 
the hospital, “the primary care physician carries the baton to be the 
leader.” Dr. Burke’s deposition testimony and his trial testimony were 
inconsistent on whether the appropriate standard of care required Dr. Gross to 
also directly communicate his findings to Hunter’s parents. In his deposition 
testimony, Dr. Burke said he had no criticism of Dr. Gross for not meeting with 
the parents and communicating the results of his examination of Hunter. At 
trial, he testified it was Dr. Gross’s responsibility “to make sure that the 
follow-up exams [were] carried out” and that he should have identified Hunter 
Burt as Hunter Taylor. He said he changed his opinion after seeing the “Dear 
Parent” letter.
        The 
evidence showed that the “Dear Parent” form letter was written by Fort Worth 
Neonatal Associates, P.A., Dr. Smith’s practice group, as opposed to 
Dr. Gross’s group. The fact that Dr. Gross might have approved the form of the 
letter should not alone constitute a continuing relationship by someone other 
than the writer of the letter. “[T]he duty to treat [a] patient . . . 
[properly] . . . flows from the consensual relationship between the patient and 
physician.” St. John, 901 S.W.2d at 423. This duty cannot be created 
unilaterally by a third-party in favor of some unknown patient. The letter 
itself does not identify the patient or the parents to whom it is written, is on 
Fort Worth Neonatal Associates, P.A. letterhead, and is signed by that group, 
not by Dr. Gross. To impose a duty on a physician based upon a third-party’s 
letter to an unidentified patient or parent would interfere with that 
physician’s ability to decline to treat the unknown patient. See, e.g., id. 
The physician-patient relationship is “wholly voluntary.” Fought v. Solce, 
821 S.W.2d 218, 220 (Tex. App.—Houston [1st Dist.] 1991, writ 
denied). And while consent may be implied, it cannot be based upon this type of 
form letter alone.
        Further, 
Alyssha testified that she had never even seen the “Dear Parent” letter. 
Thus, we cannot conclude that she or Keith relied on any part of the letter as 
implying a continuing relationship with Dr. Gross. We, therefore, hold that the 
“Dear Parent” letter did not impose a duty of continued care on Dr. Gross.
The Plan
        The 
Burts also point to Dr. Gross’s contract with the Plan, of which they were 
members. That contract, which was introduced into evidence, states that Dr. 
Gross agrees to accept as patients all Plan members referred by a referring 
primary care physician participating in the Plan. Even if we assume the Plan 
constituted evidence of Dr. Gross’s willingness or obligation to treat Hunter, 
Hunter’s parents never actually took Hunter to see Dr. Gross. While Dr. Gross 
testified that he was willing to test and treat Hunter at his office, for that 
to occur Hunter must first have been taken to that office. This is true 
regardless of Dr. Gross’s contract with the Plan. That agreement required the 
physician not to refuse treatment when and if requested by a 
member patient and referred by another plan member. No one ever took Hunter to 
Dr. Gross’s office, so he never could have refused to treat Hunter.
        We 
can compare these facts to those of Day v. Harkins & Munoz, 961 
S.W.2d 278 (Tex. App.—Houston [1st Dist.] 1997, no writ).[9]  There, two doctors agreed to provide emergency and 
first aid care to patrons at an arena during a rock concert. Id. at 279. 
A patron, Day, suffered an asthma attack after the concert and later died. Id. 
Because the concert had ended, the doctors had already left and therefore never 
treated Day. Id. The court was faced with determining whether the 
doctors’ contract with the arena gave rise to a duty to treat Day that would 
have supported his medical malpractice claim. Id. at 280. Because the 
agreement was only between the doctors and the arena, the court concluded there 
was no contract between Day, the patron, and the doctors. Id. at 281. The 
court held that, based on the doctors’ affidavits, once the concert ended or 
the doctors left the premises, their duty to provide treatment had ended; 
therefore, there was no physician-patient relationship between Day and the 
doctors as a matter of law. Id.
        Similarly, 
Dr. Gross’s examination of Hunter in the NICU was based upon his agreement 
with the Plan and his obligations to the hospital and the neonatologist 
physicians. When Dr. Smith ordered the ROP screening exam, Dr. Gross was 
required to undertake the exam and report the results back due to his contract 
with the patients’ managed care plan. But, like the two arena doctors, once 
Dr. Gross completed and reported the test results to Dr. Smith, his relationship 
with Hunter ended. Thus, under this set of facts there can be no continued duty 
owed to Hunter based on the terms of the Plan.
Scheduled-But-Missed Appointments/Name Change
        The 
undisputed facts show that Alyssha knew Hunter and Tyler had appointments with 
Dr. Gross for something wrong with their eyes because she, in fact, made their 
appointments, before they were first discharged. The appointments were also 
reviewed and discussed in preparation for the twins’ discharge, and she 
understood they would not even be discharged without the appointments. Likewise, 
Alyssha rescheduled their first missed appointments, but then failed to show up 
or call regarding the rescheduled appointments. She went by Dr. Yee’s office 
on February 18 to pick up a referral for the children’s other surgical 
procedures planned for February 19, but did not even inquire about the referral 
to Dr. Gross that she had also requested the day before. Both she and Keith 
testified that they knew something was wrong with the twins’ eyes, but did not 
know what it was or thought it was just from a cold. However, on 
cross-examination, Alyssha also testified that she knew they needed to be seen 
by a pediatric ophthalmologist. When asked “why,” she said, “[B]ecause 
they were premature, and that’s the only reason I understood. That’s the 
only thing I understood, was premature infants had to go.”
        Thus, 
after missing the first two appointments, the Burts never followed through with 
obtaining eye appointments with Dr. Gross and instead ultimately went to another 
pediatric ophthalmologist, Dr. Antinone. This is yet further evidence that 
neither Alyssha nor the children’s subsequent pediatrician thought they were 
required to see only Dr. Gross or that they had a binding relationship 
with him that required him to track them down regarding their missed 
appointments.
        The 
dissent focuses on Dr. Gross's office's failure to call or write the Burts 
regarding the patients' two missed appointments as is the office policy. 
Dissenting Op. at 10. As to the first appointment, the doctor's office did call; 
they called the Friday before the February 17 appointment as a reminder of the 
appointments and their need for a referral. Alyssha went to Dr. Yee's office the 
morning of February 17 to pick up the referral for the appointment with Dr. 
Gross that afternoon. However, Dr. Yee's office informed her that they were 
unable to obtain a referral on that short notice, so the appointment was 
rescheduled to February 28. Therefore, there was no need for Dr. Gross's office 
to call Alyssha regarding the February 17 appointment.
        Regarding 
the February 28 appointment, the twins were "no shows"; their mother 
did not call the office to cancel beforehand or afterward to reschedule. The 
dissent says that Dr. Gross was negligent regarding this appointment because his 
office failed to follow-up by postcard or phone call as the office policy 
requires. However, the policy applies to existing patients. Hunter was a 
completely new patient under the new name, "Burt." Moreover, Alyssha 
did not tell the office of Hunter's name change or that Hunter had been seen 
before. And although the initial ROP form disclosed Hunter's father's name as 
"Burt," there was no evidence showing that Hunter's files would be 
under that name instead of "Taylor." Since the office did not know 
Hunter was an existing patient, he did not get a reminder.
        We 
can contrast these facts to those in Hand v. Tavera, 864 S.W.2d 678 (Tex. 
App.—San Antonio 1993, no writ). There, as here, the physician had an 
agreement with the patient’s health care plan to provide medical care to the 
plan’s patients. Id. at 679. This relationship, coupled with the 
patient’s participation in the plan, was enough to impose a duty on the 
physician when the patient sought care. The court held: “[W]hen the 
health-care plan’s insured shows up at a participating hospital 
emergency room, and the plan’s doctor on call is consulted about treatment or 
admission, there is a physician-patient relationship between the doctor and the 
insured.” Id. at 679 (emphasis added). The doctor’s liability was 
based on his contract with the plan and the fact that the patient ”showed 
up” at the emergency room. Id. Here, unfortunately for Hunter, he 
never showed up.
        Further 
complicating this issue, the evidence mentioned above showed that Alyssha made 
the appointments for the twins under their new last name, “Burt.” Dr. 
Gross’s computer printout of appointments shows the twins as “Burt-new 
patients” whereas the hospital’s records of the NICU, and therefore Dr. 
Gross’s office records, were under the name, “Taylor.” Alyssha never 
advised Dr. Gross’s office of the name change and never told them that Hunter, 
at least, had been seen at the NICU by Dr. Gross under a different name. While 
Dr. Burke opined that Dr. Gross should have connected the two names, he provided 
no basis for that conclusion. See Tex. 
R. Evid. 702; Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 
592-93, 113 S. Ct. 2786, 2796 (1993); E.I. du Pont de Nemours & Co. v. 
Robinson, 923 S.W.2d 549, 556-57 (Tex. 1995).
        The 
dissent concludes that all these factors, coupled with Hunter's initial 
screening ROP exam in the NICU show Dr. Gross's intent to provide Hunter's 
course of treatment, not just the initial exam. Dissenting Op. at 19-20. 
Further, the dissent believes Dr. Gross's failure to follow-up the missed 
appointments coupled with the "Dear Parent" letter are enough to 
establish the continued relationship even if it might not have been enough to 
establish a new relationship. Dissenting Op. at 19-20. We believe, however, that 
none of these facts, either individually or combined, are evidence of the actual 
continuation of the physician-patient relationship. This is so, especially in 
light of the absence of evidence that anyone told Dr. Gross's office that the 
child's name had been changed, thereby leaving Hunter "Burt" 
classified as a new patient. Because the only evidence at trial is that Hunter's 
parents did not keep, but further rescheduled missed appointments, without at 
some point showing up for the appointments, there is no evidence indicating the 
patient's acceptance of continued care by Dr. Gross.
Conclusion on Dr. Gross
        While 
a previous physician-patient relationship is a factor to consider in determining 
whether the relationship and resulting duty continue, it is not alone enough to 
support the existence of the relationship. Likewise, Dr. Gross’s contract with 
the Burts’ managed care group that might have prevented him from declining the 
twins as patients at both the hospital and his office is not enough to support 
the existence of a continuing relationship; the patient must at least “show 
up” to seek the medical care. “[T]he mere act of . . . agreeing to see the 
patient at a later time [does] not establish the physician-patient 
relationship.” Jackson v. Isaac, 76 S.W.3d 177, 182 (Tex. 
App.—Eastland 2002, pet. denied) (citing Irvin v. Smith, 31 P.3d 934, 
941 (Kan. 2001)). This should be especially so when an intervening 
identification issue has arisen, as in this case.
        If 
we were to expand the duty of continued care to all patients who are seen at 
hospitals by consulting physicians beyond the hospital setting based solely upon 
the fact that they were seen by the physician in the hospital, there would be no 
end to the physician-patient relationship. Thus, all specialists or on-call 
physicians could be bound to an endless duty of continued care even if they had 
completed their assigned duty at the hospital and the patient failed to follow 
through. This is not to say that the ophthalmologist on staff or on call at a 
hospital does not owe a duty to correctly diagnose and/or treat a patient while 
at the hospital, but only that it is not enough to create a continuing duty. 
Where, as here, the specialist is requested to perform an initial screening and 
report the findings back to the NICU physician, who continues the control over 
the patient's care, we cannot impose a post-hospital never-ending duty.  
For these reasons, we hold, under the facts, that the examination of a patient 
at a hospital by a consulting or referred specialist physician does not create a 
continuing duty upon that physician to insure follow-up is maintained once the 
physician has supplied the primary or referring physician with the results 
unless the patient and the consulting or referred specialist physician take some 
further affirmative action to continue the relationship. While additional or 
different facts could arise that would change the result, we likewise hold that 
scheduled-but-missed appointments are insufficient to continue or create a duty, 
even when combined with third-party letters such as the “Dear Parent” 
letter.  The “Dear Parent” letter, along with Dr. Burke’s opinion 
that it created a duty on Dr. Gross’s part to insure follow-up visits, is less 
than a scintilla of evidence to uphold the jury’s verdict on a vital fact—a 
continued physician-patient relationship. Without a physician-patient 
relationship, there can be no duty. See St. John, 901 S.W.2d at 423. 
Therefore, we sustain Dr. Gross’s first issue.[10]
Issues Presented Relative to All Saints and Dr. Perdue
        In 
five issues, All Saints and Dr. Perdue contend that (a) the trial court 
erroneously calculated and awarded damages in the final judgment, (b) the Burts 
are not entitled to compensation for mental anguish damages, (c) the trial court 
abused its discretion in admitting the expert testimony of Dr. Miles Burke as to 
causation, (d) the trial court abused its discretion in excluding evidence of 
nystagmus unrelated to ROP, and (e) the evidence is legally and factually 
insufficient to support the jury’s findings on causation and damages. Because 
the fifth issue is dispositive, we address it first. See Tex. R. App. P. 47.1.
Facts Relative to Dr. Perdue
        Dr. 
Perdue, a board-certified pediatrician, had been working for All Saints since 
1996 when she treated the twins. She did not treat infants weighing less than 
1500 grams, but she did treat premature infants once they had been released from 
a NICU. Dr. Perdue testified that ROP is an inflammatory process in the vessels 
or retinas of premature babies, but denied that she knew how the disease 
progresses.
        She 
first saw the twins on March 20, 1997, but did not create a referral to Dr. 
Gross for both twins until May 8, 1997. Dr. Perdue’s office faxed a request to 
Dr. Yee for his records on the twins on March 27, 1997. Dr. Perdue testified 
that the prematurity of the twins was significant, as well as the fact that they 
had been in the NICU and had been rehospitalized in February and March 1997 for 
apnea and gastroesophageal reflux. She knew the original discharge summary for 
one child indicated a diagnosis of ROP and that an ophthalmology appointment had 
been scheduled for both twins with Dr. Gross upon their original discharge. The 
discharge summary from the Harris NICU showed a stage 1 ROP diagnosis for 
Hunter. Dr. Perdue never talked to Dr. Yee or Dr. Gross about the children’s 
diagnosis or treatment. Dr. Perdue’s notes from her first exam of Hunter and 
Tyler noted, “Need eye exam post-NICU, Doctor Gross.”
        The 
twins’ second visit with Dr. Perdue was on March 31, 1997. At both visits she 
knew they were supposed to see Dr. Gross as a result of his examination in the 
NICU, yet testified that at the time of the first two appointments she did not 
know why they needed to see a pediatric ophthalmologist. She did not fill 
out a specialty referral for either twin at either of the first two 
appointments, despite Alyssha telling her they both needed eye exams and the 
fact that the discharge summaries showed they did also. Dr. Yee’s records 
showed that he had previously done the referral necessary for their appointments 
with Dr. Gross, which was ready on February 19. Dr. Yee mailed his records, 
including the discharge summaries, on March 27, 1997, and Dr. Perdue testified 
that if she had those records before their March 31 checkup, she would have 
reviewed them. On March 31 the twins’ gestational age would have been about 
forty-three weeks.
        The 
twins next went to Dr. Perdue’s office on April 22, 1997. She performed 
another external eye exam on each twin, as she had done on the two prior visits, 
and noted that the exams were again “normal.”[11]  
Dr. Perdue’s notes on each chart state that the twins needed a subspecialty 
follow-up and referral to Dr. Gross.  However, Dr. Perdue did not initiate 
a referral from her office in April either, even though by then she knew they 
needed the referral as early as March.
        The 
twins’ next visit to Dr. Perdue took place on May 5.  After performing 
another external eye exam, she made another notation of “normal.”  
Sometime on May 8, Dr. Perdue prepared a referral to Dr. Gross, but there is 
nothing in her records to show that her office communicated this to the 
parents.  The referrals showed a tentative diagnosis by Dr. Perdue of ROP.
        The 
twins’ next visit was on June 9 when Dr. Perdue determined that Hunter's 
external eye exam was abnormal.  On that day’s entries she noted, 
“Subspecialty follow up on ophthalmology was planned.”  Dr. Perdue had 
no explanation as to why the referral had not been done in March, April, or 
May.  Because Dr. Gross’s schedule was so full in June, Dr. Perdue called 
another pediatric ophthalmologist, Dr. Antinone, who saw the twins on June 16, 
1997. He reported that Tyler had grade 3 scarring or retinopathy of both eyes, 
and Hunter had grade 4 scarring in his left eye with some retinal detachment. 
They were both legally blind.
Discussion of All Saints and Dr. Perdue’s Fifth 
Issue
        In 
their fifth issue, All Saints and Dr. Perdue contend that the evidence is 
legally and factually insufficient to support the jury’s findings that Dr. 
Perdue’s negligence proximately caused the children’s injuries.[12]  They contend that the testimony of Dr. Burke, the 
Burts’ pediatric ophthalmology expert, with respect to causation is unreliable 
and, therefore, insufficient to sustain the jury’s verdict that Dr. Perdue’s 
negligence proximately caused the twins’ injuries.
Causation
        All 
Saints and Dr. Perdue first contend that the evidence is legally and factually 
insufficient to show that Dr. Perdue’s negligence deprived the twins of more 
than a fifty percent chance of a different outcome. They claim that by the time 
Dr. Perdue first saw the twins, there was less than a fifty percent chance that 
treatment would have saved their eyesight.
        “The 
ultimate standard of proof on the causation issue is ‘whether, by a 
preponderance of the evidence, the negligent act or omission is shown to be a 
substantial factor in bringing about the [injury] and without which the harm 
would not have occurred.’” Marvelli v. Alston, 100 S.W.3d 460, 469 
(Tex. App.—Fort Worth 2003, pet. denied) (quoting Park Place Hosp. v. 
Estate of Milo, 909 S.W.2d 508, 511 (Tex. 1995)). This standard effectively 
bars recovery when the defendant’s negligence deprives the plaintiff of only a 
fifty percent or less chance of avoiding the complained-of harm. Kramer v. 
Lewisville Mem’l Hosp., 858 S.W.2d 397, 400 (Tex. 1992). Thus, if at the 
time of the alleged negligence, the patient has a pre-existing condition from 
which the chance of recovery is fifty percent or less, recovery will be barred. Id.
        The 
evidence at trial showed that treatment for ROP is not necessary until the 
disease reaches “threshold,” which is determined by performing a specialized 
examination of the eyes. Treatment before threshold is generally not effective; 
however, treatment must usually occur within seventy-two hours of threshold to 
improve the ultimate outcome. All of the pediatric ophthalmology experts 
testified that they could not determine when Hunter’s and Tyler’s eyes 
reached threshold because no one had performed an examination until long after 
threshold had occurred. Dr. Burke, a pediatric ophthalmologist, testified that 
the twins reached threshold. Dr. Sandra Brown, also a pediatric ophthalmologist, 
agreed that both of the twins’ eyes reached threshold. Dr. Gross testified 
that he could not say whether they ever reached threshold.
        When 
Dr. Perdue first saw the twins on March 20, 1997, they were around forty-one and 
a half weeks' postconceptional age. At that visit, Alyssha told Dr. Perdue that 
the twins had missed appointments with Dr. Gross; however, Dr. Perdue testified 
that Alyssha also told her the twins had had no eye problems while in the NICU.
Dr. Burke
        Dr. 
Burke was the Burts’ pediatric ophthalmology expert and testified that Dr. 
Perdue’s negligence was the proximate cause of the twins’ injuries. Dr. 
Burke has been a practicing pediatric ophthalmologist since 1979. From 1979 to 
1998, he was Director of the Department of Pediatric Ophthalmology at 
Children’s Hospital Medical Center in Cincinnati, Ohio. He was in private 
practice at the time of trial. Dr. Burke was one of the principal investigators 
for the CRYO-ROP study, which is the leading study of ROP in premature infants. 
He was also an examiner and certifying ophthalmologist in another study known as 
STOP-ROP. Dr. Burke estimated that he had examined over twenty thousand 
premature infants’ eyes for ROP.
        Dr. 
Burke testified that, had Dr. Perdue arranged for an emergency referral to a 
pediatric ophthalmologist when she saw the twins in late March and had the twins 
received appropriate treatment, they would have had nearly normal vision. He 
based this opinion on his personal experience with patients and his involvement 
in the CRYO-ROP study.[13]  However, Dr. Burke 
also testified that the twins reached threshold between thirty-seven and 
forty-eight weeks postconception. On cross-examination, Dr. Burke testified that 
for babies between 1000 to 1250 grams at birth, “the median for that birth 
weight [of threshold] was 37.3 weeks, and the standard deviation ranged between 
33.7 weeks to 42.9 weeks.”  Then,
   
[i]f one uses the usual range for development and identification of threshold 
disease, an examiner should have been able to identify threshold ROP between 
January 26th and March 31st, 1997. This suggests that had 
these infants been examined any time later than early April, the chance of 
treatment preserving vision would already be very small.
 
Also on cross-examination, Dr. 
Burke testified that, based on the article “Incidence and Early Course of 
Retinopathy of Prematurity,” which Dr. Burke referred to as the “bible” 
for the study of ROP, the majority of infants studied had reached threshold by 
forty-one and a half weeks postconceptional age, and at forty-two weeks, 
ninety-five percent had reached threshold. He agreed that there was a 
ninety-five percent probability based on the CRYO-ROP data that Hunter and Tyler 
had reached threshold before their first visit with Dr. Perdue. Dr. Burke also 
agreed that some higher birth weight babies, like Hunter and Tyler, reach 
threshold earlier and that he could not say exactly when the twins reached 
threshold because no examinations were done until after they had reached it.
        Dr. 
Burke testified that he did not believe the twins were suffering from severe ROP 
when they first saw Dr. Perdue, but he agreed that based on the CRYO-ROP data, 
the odds are ninety-five percent or better that the twins passed threshold 
before seeing her. On further cross-examination, Dr. Burke stated that in trying 
to determine when the twins had developed ROP, he had “placed a range in terms 
of when [he] thought” it occurred, based on statistics. He admitted that he 
could not say for sure when the children reached threshold and that because it 
could not be determined, it could only be based on “qualified previous 
information.” When cross-examined on his notes for the case, Dr. Burke noted 
that he used the natural history statistics from the CRYO-ROP study to determine 
the percentage of risk that the Burt twins had of developing ROP.
        Dr. 
Burke admitted that at the time of trial the recommended standard[14] was that at least one eye should be treated within 
seventy-two hours of a diagnosis of threshold, saying that “we think it’s 
the prudent [standard].” However, Dr. Burke stated that there is no way of 
determining from the study if treatment occurring more than seventy-two hours 
after a doctor first notes threshold in an examination would be effective. He 
agreed that seventy-two hours is the accepted standard of care. But Dr. Burke 
also testified that it has not been proven whether treatment more than 
seventy-two hours after threshold is observed is efficacious. He stated that he 
had treated some patients ninety-six hours after observing threshold, and they 
had done as well as the patients treated within seventy-two hours. Dr. Burke 
agreed, though, that in attempting to prevent blindness, therapy must be done 
within forty-eight to seventy-two hours; however, he indicated that he could not 
tell when the seventy-two hour window occurred in the twins’ eyes. He further 
agreed that treatment does not cure ROP, but may modify the course of the 
disease.
        Reading 
from the article “Prognostic Factors in the Natural Course of Retinopathy of 
Prematurity,” which Dr. Burke agreed was peer-reviewed and reliable, Dr. Burke 
noted that “[o]verall, the eyes resulting in an unfavorable macular outcome 
went from the onset of ROP to threshold in only about 17 days, which was about 
nine days faster than the eyes that fared well.” He agreed that the article 
determined that, on average, bad macular outcome in infants with ROP progressed 
very rapidly, within seventeen days from the onset of ROP.
        Dr. 
Burke testified that appropriate treatment for threshold is “[v]ery often . . 
. highly successful” for babies of similar age and weight as Hunter and Tyler 
and that “[a]lmost every single patient [he had] followed that has been 
treated for threshold has very good vision.” On cross-examination, however, 
Dr. Burke admitted that approximately forty-seven percent of the children in the 
CRYO-ROP study who were treated for threshold disease became blind.
Dr. Gross
        Dr. 
Gross testified that the vast majority of infants who reach threshold do so by 
forty-two weeks and that forty-two weeks was too late for Hunter to have been 
screened for the first time after he was discharged from the NICU. He explained 
that, based on the CRYO-ROP study, threshold means the point at which treatment 
helps and that, statistically, treatment before threshold hurts rather than 
helps. Treatment should be administered at threshold to be effective; the 
CRYO-ROP study suggests treatment should occur no later than seventy-two hours 
after threshold. Dr. Gross testified that, with treatment, a majority of 
patients had a successful outcome and defined a success story as better outcome, 
not necessarily perfect vision. Dr. Gross said that there is no cure for ROP.
Dr. Lonn Lockhart
        Portions 
of the video deposition of Dr. Lonn Lockhart, one of Dr. Perdue’s pediatric 
ophthalmology experts, were introduced into evidence. Dr. Lockhart testified 
that the examination process for ROP is specialized and is normally done by a 
pediatric ophthalmologist or retinal specialist. On cross-examination, he 
admitted that a small percentage of infants develop ROP after forty-two weeks 
and that those children are in the same birthweight group as the twins.[15]   Dr. Lockhart believed that if the twins had 
been treated timely, they would have had a greater than fifty percent chance 
that treatment of each of their eyes would have been successful.
        When 
questioned about his opinion on whether the twins’ eyes worsened between March 
20, 1997 and June 19, 1997, Dr. Lockhart opined that “early, very early in 
that period of time, they probably reached Grade 3 or cicatricial Stage III 
early in that period of time” and that “it’s probable that their Stage III 
worsened some in between 3/20 and whatever date thereafter.” Dr. Lockhart 
admitted he did not know when the twins reached threshold, so his opinion was 
based on experience and, in large part, on statistics from reviewed literature. 
He could not say whether the twins were in the ninety-five percent or the five 
percent group, and the only way to opine about when they reached threshold was 
by using the available statistics.
        Dr. 
Lockhart was of the opinion that “[m]ore likely than not [the twins] could not 
have been successfully treated at 43 weeks, based upon [his] experience and 
training.” He testified that most children with threshold ROP are successfully 
treated between thirty-six to thirty-eight weeks; he did not believe that 
intervention between March 20 and June 19, 1997 would have had a “significant 
effect on [the twins’] outcome.”
Dr. Sandra Brown
        Dr. 
Brown,[16] another pediatric ophthalmology expert 
designated by Dr. Perdue, testified that she could not say when the twins 
reached threshold, but could only make a prediction based on epidemiologic 
studies. According to Dr. Brown, the optimum time for detection and treatment of 
threshold ROP in the twins was several weeks before their first visit with Dr. 
Perdue. Dr. Brown stated that, in her opinion,
 
there is a greater than 51 [percent] probability that [the] children were past 
threshold by the time they arrived in [Dr. Perdue’s] office for [their] first 
visit. And that even if she had arranged for immediate referral for them, that 
the likelihood that there would have been a significantly improved functional 
outcome for either eye of either child is very small.

        Dr. 
Brown testified that at four months chronologic age, the twins’ chance of 
being in an “active stage of [ROP] was vanishingly small.” She explained 
that no information exists showing that treatment is effective beyond 
seventy-two hours after threshold because no one that treats premature infants 
for ROP is willing to wait longer to treat threshold ROP. In fact, Dr. Brown 
testified that treatment was usually scheduled either the same night or the next 
day after an examination where threshold was first observed and that doctors try 
to treat threshold quickly.
        According 
to Dr. Brown, “unless you assume that [the twins] crossed threshold . . . two 
days before they saw Doctor Perdue, there is a reasonable medical probability 
that they were in a very severe stage of disease by the time they reached her 
office.” Dr. Brown was unable to say when a particular child would reach 
threshold; she could only make a prediction based on statistics. Dr. Brown 
testified that the median occurrence of threshold is at 36.9 weeks, which means 
that half of the children will have reached threshold by then and half will not. 
Fewer than five percent will reach threshold after forty-two weeks 
post-conception, but there is no way of knowing which child will be in that five 
percent.
        Dr. 
Brown stated that the basis for her opinion that the twins probably would not 
have had a better outcome if Dr. Perdue had timely arranged for referral was 
“The Natural History of Retinopathy of Prematurity” and “The CRYO-ROP 
Treatment Trial” both of which Dr. Burke relied on for his opinion. She 
further relied on Table 5 of the article, “Incidence and Early Course of 
Retinopathy of Prematurity.” Based on these publications, Dr. Brown opined 
that “much more likely than not, . . . both eyes of both children had reached 
threshold and could potentially have been in threshold for a significant period 
of time prior to their first visit with Doctor Perdue, which was at about 41.5 
to 42 weeks of post-conception age.”
        Dr. 
Brown explained that outcomes could only be predicted based on statistical 
models because, without results from a specialized examination of the children, 
there is no way of knowing when the children reached threshold. However, the 
studies “allow[] us to predict the most likely course of [the twins’ ROP] in 
the absence of other information.” According to Dr. Brown, it was more likely 
than not that the twins were at threshold a week before they saw Dr. Perdue, and 
“it is more likely that they had been at threshold for some period of time.”
        Dr. 
Brown testified that only one article had been written about the effect of a 
delay in treatment. In that study, the doctor treated seven children with 
“late Stage III plus disease” outside the seventy-two-hour window, and all 
seven had unfavorable outcomes. Dr. Brown stated that it was more likely than 
not that the twins reached threshold at thirty-seven weeks.
        On 
cross-examination, Dr. Brown admitted that she could not say whether treatment 
within two days of threshold was any better than treatment within ten days of 
threshold. She agreed that, had Dr. Perdue referred the twins to a pediatric 
ophthalmologist after she received their medical records in late March 1997, 
then we would know whether the twins had reached threshold by then. Dr. Brown 
also testified on cross-examination that “[i]f they had passed threshold one 
day before seeing [Dr. Perdue], then they have the same likelihood of an 
improved outcome as any other child who had been screened all along and observed 
to approach and then crossed threshold.”
Summary of Testimony Regarding Timing of Threshold
        All 
of the experts agreed that because there is no way of knowing exactly when the 
twins reached threshold, they could only make an educated guess based on 
statistics. Dr. Burke relied on the statistics from the CRYO-ROP study in making 
his predictions about when the twins reached threshold. According to the 
CRYO-ROP study, 37.3 weeks was the median age threshold occurred in infants 
within Hunter’s birthweight range. Thus, we must assume, for purposes of 
determining whether there was a fifty percent or greater likelihood that 
Hunter’s eyes could have been successfully treated, that he reached threshold 
no earlier or later than the median age for his birthweight group. The question 
then becomes whether treatment administered approximately four weeks after 
Hunter statistically had likely reached threshold (when Dr. Perdue first saw him 
at 41.5 weeks) would have been effective in saving his eyesight. There was no 
evidence at trial of a median threshold age for babies in Tyler’s birthweight 
range because babies of his birthweight were not included in the CRYO-ROP study.
        In 
their briefs and their motion for rehearing, the Burts contend that in 
determining whether Dr. Burke’s causation testimony is reliable we should 
review, in addition to trial testimony, evidence the Burts attached to their 
response to All Saints and Dr. Perdue’s pretrial motion to exclude Dr. 
Burke’s testimony, which was not admitted at trial. It is not clear whether an 
appellate court must take into account evidence pertinent to the issue of 
reliability that is reviewed by the trial court at the pretrial stage, but not 
later admitted at trial, when determining the reliability of expert testimony 
for legal sufficiency purposes. See Exxon Corp. v. Makofski, 116 S.W.3d 
176, 181-82, 196-97 (Tex. App.—Houston [14th Dist.] 2003, pet. 
denied) (Seymore, J., dissenting) (majority opinion stating, in the context of 
determining whether Exxon waived legal sufficiency challenge by not including in 
record pretrial hearing on motion to exclude expert’s testimony, that “we 
normally test the legal sufficiency of a jury verdict by the evidence at the 
jury trial, not by what happened before or after it”). In his dissent in Makofski, 
Judge Seymore cites commentators who favor appellate court review of such 
pretrial evidence. They contend that because the proponent of the expert 
testimony has already prevailed in the trial court’s pretrial determination of 
their expert’s reliability, it might not (or fail to) re-offer its underlying 
pretrial evidence. See id. at 196 (citing Judge Harvey Brown, Procedural 
Issues Under Daubert, 36 Hous. L. 
Rev. 1133, 1139 (1999)). The Brown article also states that “the 
evidence from the hearing will be considered in determining both the 
admissibility and, indirectly, the sufficiency of the evidence, even if the 
evidence is not fully presented to the jury.” Brown, supra, at 1139.
        Here, 
it is apparent from the trial judge’s response to All Saints and Dr. 
Perdue’s trial objection to Dr. Burke’s testimony that the judge 
reconsidered the pretrial evidence submitted by the parties in ruling on the 
objection. Thus, the trial judge reconsidered that evidence at trial in 
evaluating the reliability of Dr. Burke’s testimony. Thus, we have also 
included that evidence in our legal sufficiency review. Regardless, because that 
evidence is consistent with Dr. Burke’s testimony at trial, it has no impact 
on our conclusion.
        In 
his affidavit, Dr. Burke testified that
  
“[t]he CRYO-ROP study . . . included only infants [weighing] 1250g at birth or 
less. Infants [weighing] 1251g or greater at birth were excluded from the study. 
This is significant in this case because Tyler weighed 1401g at birth and, 
therefore, the findings of the study can not be applied to him.”

                . 
. . .
 
“The CRYO-ROP study can not 
be used to determine when a particular infant will develop threshold disease. It 
can not be used to determine when Hunter Burt or Tyler Burt developed threshold 
disease. Had Hunter or Tyler been timely screened for ROP, when their threshold 
disease occurred would not be in question. Because those screening evaluations 
did not occur, we only know that they developed threshold disease at a time 
prior to June 19, 1997 and that it progressed to retinal scarring and detachment 
at a time prior to June 19, 1997.”
 
. . . .
 
“The CRYO-ROP study showed 
that 95% percent of those infants studied whose birth weight was less 
than 750g and who reached threshold, did so by 40.7 weeks postconceptional age. 
The study showed that 95% percent of those infants studied whose birth 
weight was between 750 and 999g and who reached threshold, did so by 41.9 weeks 
postconceptional age, almost one week after the lowest birth weight group. The 
study showed that 95% percent of those infants studied whose birth weight 
was between 1000-1250g and who reached threshold, did so by 42.9 weeks 
postconceptional age, one week after the middle birth weight group.”
 
“Hunter’s birth weight was 
1170g. If included in the study, Hunter falls within the heaviest birth weight 
group. Therefore, even if we make the assumption that Hunter is like the 95% of 
those infants studied within his birth weight group, he would have reached 
threshold by March 31, 1997 and likely would have stayed in threshold until 
sometime later in April.”
 
“Because Tyler’s birth 
weight was significantly higher, 1406g, within reasonable medical probability, 
he reached threshold at a later postconceptional age than Hunter. Again, infants 
with a birth weight of over 1250g were not studied. However, using the 
increments shown in the study, according to the study Tyler would have reached 
threshold by April 7, 1997 and likely would have stayed in threshold until at 
least mid April. Even if the CRYO-ROP was an epidemiological study that could be 
used to determine when Hunter and Tyler Burt more likely than not reached 
threshold, it would still be at a time after Dr. Perdue began treating them. 
According to the study, it would have been after the first visit, after she 
received the medical records from Dr. Yee and after the second visit.”
 
The Burts contend that these 
statements in Dr. Burke’s affidavit support the reliability of Dr. Burke’s 
conclusion that more likely than not the twins’ eyesight could have been 
successfully treated if Dr. Perdue had referred them for treatment when she 
first saw them. We disagree.
        On 
the one hand, Dr. Burke says the CRYO-ROP data cannot be used to predict when 
Hunter and Tyler reached threshold, then he proceeds to use that same data to 
conclude that they more likely than not reached threshold and remained at 
threshold during the time period that they were seen by Dr. Perdue. Further, 
using Dr. Burke’s logic, i.e., that Hunter was like the infants in his 
birthweight group, he more likely than not reached threshold around the time of 
the median age of that group, or 37.3 weeks. Using the same logic, Tyler, as a 
larger child whose birthweight was not studied, reached threshold one week 
later, or 38.3 weeks. Thus, Dr. Burke’s reasoning supporting his conclusions 
is based on the statistics in the CRYO-ROP study, which shows that Hunter was 
most likely at threshold at least four weeks before he saw Dr. Perdue, and Tyler 
was most likely at threshold at least three weeks before he saw Dr. Perdue.[17]
        We 
next turn to the evidence regarding whether, if Hunter and Tyler reached 
threshold by 37.3 and 38.3 weeks respectively, there was a fifty percent or 
greater chance that their eyesight could have been successfully treated if Dr. 
Perdue had immediately referred them for an examination.
Reliability of Dr. Burke’s Testimony on Causation
        While 
Dr. Perdue’s experts agreed with Dr. Burke that the twins’ eyes reached 
threshold, they disagreed on when that threshold could effectively be treated. 
Drs. Burke, Lockhart, and Brown all agreed that it was impossible to determine 
when the twins reached threshold and that they could only say that, based on 
available statistics, the twins more likely than not reached threshold before 
their first visit with Dr. Perdue. However, only Dr. Burke opined that, even 
considering that the twins probably already reached threshold by March 20, 1997, 
they still had a better than fifty percent chance of improvement if Dr. Perdue 
had immediately referred them for treatment. All Saints and Dr. Perdue contend 
that this opinion of Dr. Burke’s is unreliable; thus, the evidence is legally 
and factually insufficient to prove that Dr. Perdue’s negligence proximately 
caused the twins’ injuries.[18]
        Expert 
testimony must be relevant to the issues in a case and be based on a reliable 
foundation. Tex. R. Evid. 702; 
Robinson, 923 S.W.2d at 553; Marvelli, 100 S.W.3d at 475. The trial 
court must make an initial determination of whether the expert’s testimony is 
relevant and reliable so as to be admissible. Robinson, 923 S.W.2d at 
557; Marvelli, 100 S.W.3d at 475. However, even when challenged expert 
testimony is admitted by the trial court, a party may later complain on appeal 
that the expert testimony is legally insufficient to support the judgment 
because it is unreliable. Mar. Overseas Corp., 971 S.W.2d at 409; Austin 
v. Kerr-McGee Refining Corp., 25 S.W.3d 280, 285 (Tex. App.—Texarkana 
2000, no pet.). Unreliable expert testimony is not evidence. Merrell Dow 
Pharms., Inc. v. Havner, 953 S.W.2d 706, 714 (Tex. 1997), cert. denied, 
523 U.S. 1119 (1998); Marvelli, 100 S.W.3d at 475.
        In 
determining whether expert testimony is reliable and, therefore, some evidence 
supporting the judgment, the appellate court must employ “an almost de 
novo-like review and, like the trial court, look beyond the expert’s bare 
testimony to determine the reliability of the theory underlying it.” Austin, 
25 S.W.3d at 285; see Guadalupe-Blanco River Auth. v. Kraft, 77 
S.W.3d 805, 808 (Tex. 2002); Havner, 953 S.W.2d at 713. “An expert’s 
simple ipse dixit[19] is insufficient to establish a 
matter; rather, the expert must explain the basis of his statements to link his 
conclusions to the facts.” Earle v. Ratliff, 998 S.W.2d 882, 890 (Tex. 
1999) (footnote added). The court does not focus on the correctness of the 
expert’s opinion, but on the reliability of the analysis the expert used in 
reaching his or her conclusions. State Farm Fire & Cas. Co. v. Rodriguez, 
88 S.W.3d 313, 319 (Tex. App.—San Antonio 2002, pet. denied) (op. on reh'g).
        The 
supreme court has articulated six nonexclusive factors appellate courts should 
consider in determining whether scientific testimony is reliable:
  
(1) the extent to which the theory has been or can be tested; (2) the extent to 
which the technique relies upon the subjective interpretation of the expert; (3) 
whether the theory has been subjected to peer review and publication; (4) the 
technique’s potential rate of error; (5) whether the underlying theory or 
technique has been generally accepted as valid by the relevant scientific 
community; and (6) the non-judicial uses that have been made of the theory or 
technique.
 
Havner, 953 S.W.2d at 
714; Robinson, 923 S.W.2d at 557. Scientific evidence that is not based 
on “the methods and procedures of science” is no more than a “subjective 
belief or unsupported speculation.” Robinson, 923 S.W.2d at 557. “If 
the foundational data underlying opinion testimony are unreliable, an expert 
will not be permitted to base an opinion on that data because any opinion drawn 
from that data is likewise unreliable.” Havner, 953 S.W.2d at 714. In 
addition, if the expert’s conclusions from data are based upon flawed 
methodology, the testimony is unreliable even if the data is sound. Id.
        The 
Texas Supreme Court has recognized that the Robinson analysis may not 
apply to certain types of expert testimony. Helena Chem. Co. v. Wilkins, 
47 S.W.3d 486, 499 (Tex. 2001) (citing Gammill v. Jack Williams Chevrolet, 
Inc., 972 S.W.2d 713, 726 (Tex. 1998)). In these types of cases, there must 
still be a reliable basis for the expert’s opinion. Id. “Experience 
alone may provide a sufficient basis for an expert’s testimony” unless there 
is “too great an analytical gap between the data and the opinion proffered.” 
Gammill, 972 S.W.2d at 726-27. Thus, regardless of whether the Robinson 
factors are applied, the proponent of the expert testimony must prove that it is 
based upon a reliable foundation. Rodriguez, 88 S.W.3d at 319.
        All 
Saints and Dr. Perdue contend that Dr. Burke’s opinion that the twins could 
have been successfully treated even if, statistically, they were already 
seventy-two hours past threshold when Dr. Perdue first saw them, is unreliable 
and, therefore, no evidence that Dr. Perdue proximately caused the twins’ 
injuries. As was the case in Havner, the issue before us is not whether 
Dr. Burke possesses adequate credentials, skill, or experience to testify about 
the cause of the twins’ injuries. See Havner, 953 S.W.2d at 711. All 
Saints and Dr. Perdue do not challenge Dr. Burke’s qualifications. He had been 
involved in two major studies of ROP, had co-authored between twenty-five and 
thirty articles on the subject, and had significant firsthand experience in 
treating infants with the disease. Rather, the issue is whether Dr. Burke’s 
opinion regarding the success of treatment in this particular case is based on a 
reliable foundation.
        In 
his affidavit attached to the Burts’ response to All Saints and Dr. Perdue’s 
pretrial motion to exclude, Dr. Burke states the following:
  
“My opinions, as discussed 
in this affidavit and my deposition, regarding the timing of threshold disease 
and the effectiveness of treatment have been well tested and are well documented 
in numerous peer reviewed articles and studies. These opinions are an objective 
interpretation of the data and have been adopted by and generally accepted as 
valid by myself and my colleagues. As a pediatric ophthalmologist, I have 
personally examined thousands of eyes for retinopathy of prematurity and my 
opinions are supported by my vast clinical experience.”
 
This is merely a conclusory 
statement, however; therefore, we must look to other evidence to determine if 
Dr. Burke’s opinion is based upon a reliable foundation. See Robinson, 
923 S.W.2d at 559 (holding doctor’s “self-serving statements that his 
methodology was generally accepted and reasonably relied upon by other experts 
in the field” insufficient to “establish the reliability of the technique 
and theory underlying his opinion”).
        In 
his affidavit, Dr. Burke stated that:
  
“The CRYO-ROP study is not an epidemiological study on when it is too late to 
treat threshold disease. The purpose of the study was to show the natural 
history of the disease in order to increase the efficacy of treatment, not to 
show when treatment would not be beneficial. In fact, the infants included in 
the study were screened at two week intervals and if and when threshold disease 
was detected, treatment was performed within 42-72 hours. This 42-72 hour time 
period was picked arbitrarily and is not and was not intended to mean that ROP 
remains at threshold disease for up to 72 hours. When threshold disease was 
detected in the studied infants, it very well could have been present for 
as long as two weeks, or the time period since the last screening. No other 
screening schedule was tested and no other time period between threshold 
detection and treatment was tested.” [Emphasis added.]
  
        In 
addition to Dr. Burke’s affidavit, the deposition testimony of Dr. James 
Reynolds, a pediatric ophthalmologist hired by Dr. Gross, was attached to the 
Burts’ response to All Saints and Dr. Perdue’s motion to exclude. When 
discussing the relevant dates for predicting when the twins reached threshold, 
Dr. Reynolds stated that:
  
There’s no one, no expert that can tell you when things happened in these 
babies because we have no retinal findings to guide us; however, if we say where 
do these babies fit on the bell curve of the population statistics of the 
natural history of this disease, we can answer those things. We can say, This is 
the natural history of this disease, this bell curve encompasses the entire 
population, and then you can say, Well, where would they be on the curve at X 
time? That doesn’t mean that their disease followed an average course at all. 
It just means that it had to follow an average course, it had to follow an 
exceptional course. It followed a course, and I doubt whether the course that 
these two followed is outside the natural history of this disease.
 
        When 
asked if he had an opinion on the latest date that treatment of the twins would 
have been effective, Dr. Reynolds stated:
  
No. I think that opinion is not possible at – as of a certain date. In other 
words, I can tell you the population statistics and I can tell you when the last 
date on a large population and which patients went to pre-threshold disease, the 
last date – well, let’s say 99 percent, I can tell you the 99 percentiles of 
latest pre-threshold, latest threshold, but it would be very difficult, even 
knowing population statistics, to tell you there is a date upon which I am sure 
that the window of opportunity for treatment is past.
 
He went on to testify as 
follows:
  
[Dr. Reynolds:] I don’t 
think there is anything to suggest that treatment within three days of Zone 2 
threshold retinopathy of prematurity is better than treatment within five days. 
That was never studied, it has never been determined, and in my clinical 
expertise personally I would say there is no difference in Zone 2 disease as 
opposed to Zone 1 disease.
  
. . . .
  
. . . . Patients can stay at 
threshold for a very short time before they develop a detachment. Patients can 
stay at threshold for quite a long time before they develop a detachment.
  
. . . .
  
[Dr. Perdue’s counsel:] But 
certainly when you do note that an infant has reached threshold in an eye, you 
don’t delay therapy.
  
[Dr. Reynolds:] Correct. That 
was the – you know, the by-product of an arbitrary protocol [the treatment 
within 72 hours standard recommended as a result of the CRYO-ROP study] is that 
everybody says this treatment works in this framework, let’s everybody do it 
in this framework.
  
. . . .
  
[Dr. Reynolds:] But it 
might have worked just as well if five days was the limit.
  
[Dr. Perdue’s counsel:] Might 
or might not have; you don’t–
  
[Dr. Reynolds:] Right, it 
might not have.
  
[Dr. Perdue’s counsel:] You 
don’t know that, do you?
  
[Dr. Reynolds:] Don’t 
know that.
  
[Dr. Perdue’s counsel:] What 
we do know is that it’s recommended that the therapy be administered between 
24 and 72 hours of threshold.
  
[Dr. Reynolds:] Correct.
  
[Dr. Perdue’s counsel:] And 
that’s the best medical statistic we have on efficaciousness of ablative 
therapy.
  
. . . .
  
[Dr. Reynolds:] Right, it’s 
the only protocol that has been tested. No other protocol with a different 
window was ever tested.
  
. . . .
  
[Dr. Reynolds:] That time 
window has been proven safe and efficacious. No other time window has been 
tested. We do know that threshold can last longer because we have had controls.
  
. . . .
  
[Dr. Reynolds:] But controls 
now are not acceptable. The standard of care is 24/72.
  
[Dr. Perdue’s counsel:] 
Controls or case reports are anecdotal?
  
[Dr. Reynolds:] No, no. 
Controls are not. . . . the studies have always had – we followed the natural 
history of patients we purposely didn’t intervene on. [Emphasis added.]
 
        Dr. 
Burke admitted at trial that there were no studies supporting his theory that 
threshold disease could be treated effectively outside the seventy-two hour 
window recommended by the CRYO-ROP study and other studies because no physician 
would knowingly withhold treatment upon an observation of threshold ROP. See 
Couch v. Simmons, 108 S.W.3d 338, 341-43 (Tex. App.—Amarillo 2003, no 
pet.) (holding evidence supported trial court’s finding that expert’s 
testimony—that earlier administration of IV fluids would have prevented 
patient’s stroke—was unreliable and inadmissible because expert’s own 
affidavit stated that theory had not been tested because no physician would 
intentionally withhold IV fluids to test theory and two peer-reviewed articles 
expert relied on indicated that there is no “specific beneficial 
relationship” between administration of IV fluids and stroke outcome); Helm 
v. Swan, 61 S.W.3d 493, 498 (Tex. App.—San Antonio 2001, pet. denied) 
(holding unreliable expert testimony that earlier intravenous fluid therapy 
would have improved patient’s chances of recovery from severe necrotizing 
pancreatitis because no medical literature supported the opinion and noting that 
such support was absent because “no medical professional would intentionally 
delay” the therapy). Additionally, in the only study cited by any of the 
pediatric ophthalmology experts where treatment did not occur within seventy-two 
hours of threshold, none of the patients achieved a positive outcome. 
Furthermore, Dr. Burke’s testimony regarding his own personal experience 
supports only the conclusion that treatment within ninety-six hours after 
observing threshold has been effective in his patients. Cf. In re D.S., 
19 S.W.3d 525, 529-30 (Tex. App.—Fort Worth 2000, no pet.) (holding that 
expert’s testimony, based on experience alone, that a child had been forcibly 
immersed in hot water was reliable when expert’s theory was not subject to 
human testing because it would be immoral, expert had over twenty-five years’ 
experience treating child and adult burn victims, and expert explained how burn 
patterns correlated to a person’s typical response to contact with hot 
liquids). Thus, the record before us, including Dr. Burke’s pretrial 
affidavit, shows no basis for Dr. Burke’s opinion other than his belief that 
treatment beyond ninety-six hours after threshold would have been effective. See 
Makofski, 116 S.W.3d 188-89 (holding—after concluding that studies cited 
by some of the appellee’s experts did not support their opinions and that one 
of appellee’s expert’s opinions had no basis—that expert’s “belief 
that a substance might cause a disease is no evidence that in reasonable 
probability it did”).
        Had 
Dr. Burke been able to testify to any personal knowledge or experience or any 
scientific data supporting his theory that treatment more than ninety-six hours 
after threshold would have resulted in a better outcome for the twins’ eyes, 
the outcome of our analysis would likely be different. However, based on the 
evidence before us, there is no reliable foundation for Dr. Burke’s testimony 
that the twins’ eyesight would have been improved if Dr. Perdue had referred 
them for treatment when she first saw them. Thus, the only conclusion supported 
by reliable evidence is that the twins had more likely than not reached 
threshold and passed the seventy-two-hour window for treatment (and even the 
ninety-six-hour window that Dr. Burke testified he had personally observed) 
before being seen by Dr. Perdue. Because the only reliable evidence shows that 
there was a fifty percent or greater chance that the twins could not have been 
successfully treated by the time Dr. Perdue took over their care, any acts or 
omissions of Dr. Perdue could not have been a substantial factor in causing the 
twins' injuries; therefore, the Burts cannot recover for any negligence of Dr. 
Perdue. See Kramer, 858 S.W.2d at 400.
        We 
hold that, under either the six Robinson factors or the Gammill 
analytical gap test, Dr. Burke’s testimony that Dr. Perdue’s negligence 
proximately caused the twins’ injuries is unreliable,[20] 
and, therefore, constitutes no evidence that Dr. Perdue’s negligence was a 
proximate cause of the twins’ injuries. See Havner, 953 S.W.2d at 730. 
Because there is no scientifically reliable evidence to support the jury’s 
verdict that Dr. Perdue's acts or omissions were a proximate cause of the 
twins’ injuries, we sustain All Saints and Dr. Perdue’s fifth issue.[21]
Modification of Interest Rates to Judgment
        In 
post-submission briefs, Dr. Gross, All Saints, and Dr. Perdue have asserted that 
recent changes to the Texas Finance Code should apply to the pre- and 
post-judgment rates used by the trial court in computing its judgment. Tex. Fin. Code Ann. § 304.003(c) 
(Vernon Supp. 2004). Because we are rendering judgment in their favor, the 
question of whether the new rates of interest apply is mooted and we do not need 
to address it here. See, e.g., Williams v. Lara, 52 S.W.3d 171, 184 (Tex. 
2001); Valley Baptist Med. Ctr. v. Gonzalez, 33 S.W.3d 821, 822 (Tex. 
2000). See generally Columbia Med. Ctr. v. Bush, 122 S.W.3d 835, 866 
(Tex. App.—Fort Worth 2003, pet. denied) (holding new interest rates do not 
apply to cases pending on appeal on statute's effective date).
Conclusion
        Having 
sustained Dr. Gross’s first and fifth issues, we reverse the trial court’s 
judgment against him and render judgment in his favor. Likewise, having 
sustained All Saints and Dr. Perdue’s fifth issue as to causation, we reverse 
the trial court’s judgment against them and render judgment in their favor.

  
  
                                                                  TERRIE 
LIVINGSTON
                                                                  JUSTICE
   
 
PANEL A:   LIVINGSTON 
and WALKER, JJ.; SAM J. DAY, J. (Retired, Sitting by Assignment).
 
WALKER, J. filed a dissenting 
opinion.
 
DELIVERED: September 2, 2004
 

 
COURT OF APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH
 
NO. 2-01-206-CV
  
  
ROBERT 
GROSS, M.D.,                                                        APPELLANTS
AND 
ALL SAINTS INTEGRATED
AFFILIATES 
D/B/A ALL SAINTS
MEDICAL 
ASSOCIATES, AND
STEPHANIE 
PERDUE, M.D.
  
V.
  
ALYSSHA 
AND KEITH BURT,                                                   APPELLEES
INDIVIDUALLY 
AND AS NEXT
FRIENDS 
FOR HUNTER AND
TYLER 
BURT, MINOR CHILDREN
  
  
------------
 
FROM 
THE 342ND DISTRICT COURT OF TARRANT COUNTY
 
------------
 
DISSENTING OPINION ON 
REHEARING
 
------------
I. Introduction
        I 
respectfully dissent from the majority’s disposition of Dr. Gross’s appeal. 
The evidence does not conclusively establish termination of the 
physician-patient relationship between Dr. Gross and Hunter, and viewing the 
evidence in the light most favorable to the jury’s verdict and disregarding 
all contrary evidence and inferences, the evidence is legally sufficient to 
support the deemed finding that at the time in question Hunter Burt was Dr. 
Gross’s patient with respect to Hunter’s retinopathy of prematurity (ROP). 
Consequently, I would decline to reverse the trial court’s judgment against 
Dr. Gross on the grounds articulated by the majority and would, instead, address 
Dr. Gross’s remaining issues. Thus, I would grant rehearing en banc as to Dr. 
Gross.[1]
II. 
Physician-Patient Relationship Between Dr. Gross and Hunter
        Dr. 
Gross does not dispute that he had a physician-patient relationship with Hunter 
when he examined Hunter for ROP in the hospital. He stated below in the trial 
court that “[w]e are not taking the position that there was no relationship 
for the examination in the hospital.” Instead, Dr. Gross claims in his first 
issue that “[w]ith respect to the jury’s finding that Dr. Gross’[s] 
negligence caused any harm to Hunter Burt . . . Dr. Gross’[s] limited 
physician-patient relationship with Twin B, a/k/a Hunter ‘Taylor,’ terminated 
upon completion of the ROP screen.” [Emphasis added.]
        Termination 
of an existing physician-patient relationship is an affirmative defense or a 
matter in avoidance which the physician bears the burden of pleading and 
proving. Accord Tex. Beef Cattle Co. v. Green, 921 S.W.2d 203, 212 (Tex. 
1996) (jury's finding of affirmative defense of justification rendered 
immaterial finding of actual malice); Sunsinger v. Perez, 16 S.W.3d 496, 
500 (Tex. App.—Beaumont 2000, pet. denied) (discussing defendant doctor’s 
motion for summary judgment on ground of affirmative defense that patient had 
terminated physician-patient relationship). Although Dr. Gross contended at 
trial and asserts on appeal that his physician-patient relationship with Hunter 
with respect to Hunter’s ROP terminated following the in-hospital screening, 
he did not request a termination special question or instruction or object to 
the lack of such a question or instruction. Consequently, no such question or 
instruction was submitted.[2]  If a party 
totally fails to request that a particular defense be included in the court’s 
charge, it is waived unless it is conclusively established as a matter of law. See 
Tex. R. Civ. P. 279 (providing 
that upon appeal all independent grounds of recovery or defense not conclusively 
established under the evidence and upon which no issue is given or requested 
shall be deemed as waived); see also Gulf State Utils. Co. v. Low, 79 
S.W.3d 561, 565 (Tex. 2002) (recognizing that a party waives an entire theory of 
defense by not objecting to its omission from the charge); Vickery v. Comm. 
for Lawyer Discipline, 5 S.W.3d 241, 253 (Tex. App.—Houston [14th 
Dist.] 1999, pet. denied) (same).
        Therefore, 
the issue presented by Dr. Gross’s complaint that “[w]ith respect to the 
jury’s finding that Dr. Gross’[s] negligence caused any harm to Hunter Burt 
. . . Dr. Gross’[s] limited physician-patient relationship with Twin B, a/k/a 
Hunter ‘Taylor,’ terminated upon completion of the ROP screen” was waived, 
unless termination of the physician-patient relationship between Dr. Gross and 
Hunter was established as a matter of law. See Gulf State Utils., 79 
S.W.3d at 565; see also Woods v. William M. Mercer, Inc., 769 S.W.2d 515, 
518 (Tex. 1988) (holding discovery rule was independent ground of defense under 
rule 279 and that failure to request findings or object to charge not submitting 
discovery rule waived right to complain on appeal).
        During 
the charge conference in this case, a lengthy debate occurred concerning whether 
to submit the Burts’ requested jury special question on the existence of a 
physician-patient relationship between Dr. Gross and Hunter. See 3 Comm. on Pattern Jury Charges, State Bar of 
Tex., Texas Pattern Jury Charges PJC 50.6 (2d. ed. 2002) (setting forth a 
physician-patient relationship special question). Ultimately, counsel for Dr. 
Gross and for Hunter agreed that the trial court had found as a matter of law 
that a physician-patient relationship existed between Dr. Gross and Hunter, at 
least at the time of Dr. Gross’s in-hospital examination of Hunter. Dr. Gross 
did not object to the omission of a physician-patient relationship special 
question from the charge. Consequently, to the extent Dr. Gross’s first issue 
constitutes a challenge to the legal sufficiency of the evidence to establish a 
post-hospital-examination physician-patient relationship between Dr. Gross and 
Hunter, that finding is deemed in support of the judgment. See Tex. R. Civ. P. 279; In re J.F.C., 
96 S.W.3d 256, 262-63 (Tex. 2002).
        Under 
this analysis, the issue presented by Dr. Gross’s “no evidence” complaint 
that “[w]ith respect to the jury’s finding that Dr. Gross’[s] negligence 
caused any harm to Hunter Burt . . . Dr. Gross’[s] limited physician-patient 
relationship with Twin B, a/k/a Hunter ‘Taylor,’ terminated upon completion 
of the ROP screen” is whether legally sufficient evidence exists supporting 
the deemed finding of a physician-patient relationship between Dr. Gross and 
Hunter with respect to Hunter’s ROP. In conducting this legal sufficiency 
analysis, we are required to view the evidence in the light most favorable to 
the jury’s verdict and to disregard all evidence and inferences to the 
contrary. See, e.g., St. Joseph Hosp. v. Wolff, 94 S.W.3d 513, 519 (Tex. 
2002). Viewing the evidence in the light most favorable to the jury’s verdict, 
disregarding all evidence and inferences to the contrary, more than a scintilla 
of evidence exists of a physician-patient relationship between Dr. Gross and 
Hunter with respect to Hunter’s ROP following the in-hospital examination.
A. Legally Sufficient Evidence Supports Deemed Finding
of Physician-Patient Relationship
        The 
parties agree that Dr. Gross had a physician-patient relationship with Hunter 
with respect to Hunter’s ROP when he examined and diagnosed Hunter in the 
hospital on February 8, 1997. In 1996, the American Academy of Pediatrics, the 
American Association for Pediatric Ophthalmology and Strabismus, and the 
American Academy of Ophthalmology approved guidelines concerning screening 
premature infants for ROP. The guidelines state that infants with a birth weight 
of under 1500 grams or with a gestational age of 28 weeks or less should have a 
dilated indirect ophthalmoscopic examination to detect ROP. The examination 
should be carried out by an ophthalmologist with experience in the examination 
of preterm infants. This is the examination Dr. Gross conducted on Hunter to 
diagnose Hunter with ROP.
        The 
American Academy of Pediatrics, the American Association for Pediatric 
Ophthalmology and Strabismus, and the American Academy of Ophthalmology also 
approved guidelines which state that infants with ROP, like Hunter, “should be 
seen at least every 1 to 2 weeks until normal vascularization proceeds to Zone 
III or the risk of attaining threshold conditions is passed.” According to Dr. 
Gross, these guidelines constitute the standard of care for a pediatric 
ophthalmologist treating an infant with ROP.[3]  
Likewise, Dr. Burke, the Burt’s expert, testified at trial that it was Dr. 
Gross’s responsibility “to make sure that the follow-up examinations be 
carried out” and that Dr. Gross should have identified Hunter Burt as Hunter 
Taylor.
        Dr. 
Yee testified that Dr. Kim Smith called him on February 12, 1997, and told him 
that the twins had a February 17, 1997 follow-up appointment with Dr. Gross 
because Hunter had been diagnosed by Dr. Gross as having ROP.  Nonetheless, 
although he had six days, Dr. Yee did not complete Hunter’s referral papers to 
Dr. Gross’s office prior to the scheduled visit. Dr. Yee completed the 
referral papers on February 19, 1997, too late for Hunter to make the February 
17 appointment with Dr. Gross.
        Alyssha 
Burt testified that she learned on the evening of February 8 that Dr. Gross had 
examined Hunter’s eyes in the hospital that day.  The nurse told Alyssha 
that the exam was “great,” “a one, the best.” While the twins were still 
in the hospital, a nurse told Alyssha to call Dr. Gross and set up an 
appointment for the boys to have their eyes examined.  She did, and the 
appointment was set for February 17.  When she made the appointment, Dr. 
Gross’s office did not mention the need for a referral.  Alyssha had no 
idea why the Hunter needed to have his eyes examined other than simply because 
he was premature.  Her only understanding was that “premature infants had 
to go” for opthalmic exams.
        Dr. 
Gross’s office called Alyssha on Friday, February 14, before the scheduled 
Monday February 17 appointment, and told her that the office did not have the 
referral papers necessary for the appointment. The morning of the February 17, 
Alyssha talked with Dr. Yee’s office and learned that the referral could not 
be completed in time for Hunter's eye appointment that afternoon. Alyssha called 
Dr. Gross’s office and relayed this information; she was told to reschedule 
the appointment. She rescheduled it for February 28, but Hunter was in the 
hospital on that date with a virus.
        Hunter’s 
referral to Dr. Gross by Dr. Yee lists the patient’s name as “Hunter W. 
Taylor (Burt)” and indicates that his parents are Alyssha Taylor and Keith 
Burt.[4]  Dr. Gross testified that upon 
receiving such a referral, his office should have checked under the last name of 
both Taylor and Burt to see if a corresponding appointment existed. Dr. Gross 
explained:
  
[I]f somebody’s been seen in the hospital, then when we receive a call from 
the parent to schedule an appointment for a baby by the same name, then when we 
go to schedule that appointment, we immediately know that they’ve been to see 
us before, because they’re in our filing system already . . . . And that 
appointment is scheduled as a follow-up appointment.  And we know 
exactly why the patient’s coming in because we’ve already seen them 
before.  [Emphasis added.]
 
The 
reasonable inference from this testimony by Dr. Gross is that at the time 
Alyssha communicated with Dr. Gross's office on February 14 and 17, Hunter was 
not a “new patient,” he was an existing ROP patient who had already been 
seen in the hospital and needed a follow-up appointment.
        Maria 
Rodriguez, Dr. Gross’s receptionist in February 1997, testified that Dr. 
Gross’s office obtained phone numbers for patients when they called in to 
schedule an appointment.  Sometimes, she would obtain the patient’s 
address, “just to get the medical records started.”  When Rodriguez had 
time, she called to confirm appointments.  If she knew what insurance the 
patient had, she would remind the patient to bring a referral form.  
Rodriguez testified that Dr. Gross’s office had a policies and procedures 
manual, which required that the parent be contacted by phone or postcard when a 
patient did not show up for an appointment.  Although Dr. Gross testified 
that babies seen in the hospital were scheduled as follow-up appointments, not 
as new patients, Alyssha was not contacted by Dr. Gross’s office concerning 
either of the appointments that Hunter missed.
        Jimmie 
McMurray testified that in February 1997, she worked in Dr. Gross’s office 
doing insurance billing. She said that after Dr. Gross performed a ROP initial 
evaluation, he completed a form that included the patient’s name, address, and 
telephone number.  He would bring that form back to his office and give it 
to McMurray.  The ROP evaluation form for Hunter shows that "[Alyssha] 
Taylor [and] [Keith] Burt"[5] are his parents 
and provides a address and phone number for the patient.  Dr. Gross’s 
records concerning Hunter indicate that Hunter was a “preemie,” i.e., a 
premature baby.
        Dr. 
Yee knew monitoring the twins’ vision was important, but he expected Dr. Gross 
to examine the twins and then to tell him when they needed to be seen again. The 
“Dear Parent” letter demonstrates Dr. Gross’s agreement to do just that. 
The letter explains that an in-hospital eye examination is scheduled and that 
this exam is performed on babies meeting certain birth weight and prematurity 
standards.  It states, “You will be contacted by your baby’s 
pediatric ophthalmologist if any significant findings are detected which 
would in any way affect your baby’s health or vision.”  The letter goes 
on to state, “In specific circumstances, your pediatric ophthalmologist 
may request another ophthalmologist consultant to also check you baby’s eyes. 
Robert D. Gross, M.D., is the Pediatric Ophthalmologist who staffs our NICU.” 
[Emphasis added.]  Dr. Gross knew the neonatologist group was using this 
letter, and Dr. Gross told them “that that was fine with me.”
        I 
agree with the majority’s recitation of historical Texas law that a medical 
malpractice claim is predicated on the existence of a physician-patient 
relationship.  See, e.g., St. John v. Pope, 901 S.W.2d 420, 423 
(Tex. 1995).  Where no prior relationship exists, the doctor must take some 
affirmative step to treat the patient before a relationship can be established. Ortiz 
v. Shah, 905 S.W.2d 609, 611 (Tex. App.—Houston [14th Dist.] 
1995, writ denied); Lopez v. Aziz, 852 S.W.2d 303, 306 (Tex. App.—San 
Antonio 1993, no writ).  Once such a relationship exists, however, the 
physician owes the patient a duty to treat him or her with the skills of a 
trained, competent professional, and a breach of that duty may give rise to a 
malpractice action. Reynosa v. Huff, 21 S.W.3d 510, 513 (Tex. App.—San 
Antonio 2000, no pet.).
        Here, 
it is undisputed that an initial physician-patient relationship existed between 
Dr. Gross and Hunter with respect to Hunter’s ROP.  Consequently, I 
believe that the issues before us are whether the evidence proves as a matter of 
law that the relationship was terminated and whether the evidence, viewed in the 
light most favorable to Hunter, constitutes more than a scintilla of evidence of 
a continued physician-patient relationship with respect to Hunter’s ROP. The 
cases relied upon by the majority, however, address only whether an initial 
physician-patient relationship was created, not whether an existing 
physician-patient relationship later continued or was terminated.  See, 
e.g., Majzoub v. Appling, 95 S.W.3d 432, 437 (Tex. App.—Houston [1st 
Dist.] 2002, pet. denied) (op. on reh'g) (recognizing that no physician-patient 
relationship was created when “there was no prior physician-patient 
relationship between Mr. Majzoub and Dr. Appling,” Dr. Appling never saw, 
talked to, or examined Majzoub, and Dr. Appling did not proffer a medical 
diagnosis of Majzoub's condition or make any medical decisions regarding Majzoub); 
Jackson v. Isaac, 76 S.W.3d 177, 182 (Tex. App.—Eastland 2002, pet. 
denied) (holding no physician-patient relationship was created when doctor had 
never examined patient and patient failed to “show up” for medical treatment 
because he died before first scheduled appointment with doctor); Ortiz, 
905 S.W.2d at 611 (holding no physician-patient relationship was created when 
on-call doctor never examined patient, talked to him, or gave advice to anyone 
in emergency room about patient); Day v. Harkins & Munoz, 961 S.W.2d 
278, 281 (Tex. App.—Houston [1st Dist.] 1997, no writ) (holding no 
physician-patient relationship was created when doctors who agreed only to 
provide emergency and first aid care to patrons at a concert never treated 
patient at concert). Consequently, these cases are factually distinguishable 
from the present case.
        The 
St. John case is instructive.  In St. John, an emergency room 
doctor phoned the hospital's on-call physician, Dr. St. John, a board-certified 
internist, and described the patient's symptoms.  901 S.W.2d at 
421-22.  Dr. St. John determined that the hospital was not equipped to 
treat the patient and recommended that the patient be referred to another 
hospital.  Id. at 422.  The supreme court held that the duty to 
treat a patient with proper professional skill flows from the consensual 
relationship between the patient and the physician. Id. at 423.  The 
supreme court held that, as a matter of law, no physician-patient relationship 
existed between Dr. St. John and the patient because Dr. St. John never agreed 
to treat the patient.  The supreme court explained:
  
Although St. John listened to Suarez's description of Pope's symptoms, and came 
to a conclusion about the basis of Pope's condition, he did so for the purpose 
of evaluating whether he should take the case, not as a diagnosis for a 
course of treatment.
 
Id. 
at 424 (emphasis added).  The supreme court further explained that “[i]t 
is only with a physician's consent, whether express or implied, that the 
doctor-patient relationship comes into being.”  Id. at 423.
        Although 
St. John also involved the initial formation of the physician-patient 
relationship as opposed to the continuation or termination of that relationship, 
the supreme court’s analysis focused on two factors that are also applicable 
to the continuation and termination issues: whether the doctor diagnosed the 
patient for a course of treatment and whether the doctor expressly or impliedly 
consented to accept the patient to administer the course of treatment. Focusing 
on these two factors in addressing whether the physician-patient relationship 
between Dr. Gross and Hunter continued following Dr. Gross’s in-hospital 
examination and diagnosis of Hunter, more than a scintilla of evidence exists 
that Dr. Gross diagnosed Hunter for a course of treatment that he, Dr. Gross, 
intended to provide.
        Dr. 
Gross examined Hunter in the hospital, diagnosed him with ROP, and knew that 
Hunter required follow-up appointments with a pediatric ophthalmologist. Dr. 
Gross recommended a follow-up appointment in two weeks—with himself.  He 
did not tell Alyssha or anyone at the hospital that the follow-up appointments 
should not be scheduled with him.  Dr. Gross voluntarily approved a letter 
identifying himself as “your pediatric ophthalmologist,” knowing the letter 
would be attached to Hunter’s basinet in the hospital.  Dr. Gross took 
Hunter’s ROP screening form to his office so Hunter could be entered as an 
existing patient for ROP follow-up appointments.  Alyssha called, 
scheduled, and rescheduled appointments for Hunter with Dr. Gross.  Thus, 
more than a scintilla of evidence exists that, unlike Dr. St. John, Dr. Gross 
did see and evaluate the patient, i.e., Hunter, to diagnose him for a course of 
treatment.
        Likewise, 
more than a scintilla of evidence exists that Dr. Gross either expressly or 
impliedly consented to the continuation of his physician-patient relationship 
with Hunter.  Dr. Gross and Dr. Burke both recognized that the standard of 
care required a pediatric ophthalmologist to conduct follow-up appointments with 
Hunter.  The “Dear Parent” letter approved by Dr. Gross constitutes 
some evidence that Dr. Gross voluntarily continued to be Hunter’s 
pediatric ophthalmologist with respect to the ROP follow-up appointments.  
The majority discounts the “Dear Parent” letter, noting that Hunter’s 
parents did not rely upon it.  Maj. Op. at 20.  But viewed in the 
light most favorable to Hunter, this letter, approved by Dr. Gross, nonetheless 
constitutes evidence that Dr. Gross perceived his physician-patient relationship 
with Hunter with respect to the treatment of Hunter’s ROP as ongoing, that he 
consented to the ongoing nature of the relationship, and that he did not intend 
to terminate the relationship when Hunter left the hospital.  Dr. Burke 
testified that it was Dr. Gross’s responsibility to make sure that the 
follow-up exams on Hunter were carried out—further evidence of the continuing 
nature of Dr. Gross’s relationship with Hunter.
        Additionally, 
the fact that Dr. Gross utilized a specific form when he performed in-hospital 
ROP exams on premature newborns, provided that form to his office insurance 
billing employee, and had the newborn’s information entered into his computer 
system as an existing patient likewise constitutes some evidence that Dr. 
Gross’s physician-patient relationship with Hunter continued.  Dr. Gross 
himself testified that for a follow-up appointment “we know exactly why the 
patient’s coming in because we’ve already seen them before,” i.e., 
that an ongoing physician-patient relationship exists.  Finally, the fact 
that Dr. Gross’s office followed a specific procedure when a premature infant 
missed a scheduled ROP follow-up appointment—calling the parent or sending a 
card—constitutes more than a scintilla of evidence of Dr. Gross’s consent to 
the continuation of his physician-patient relationship with these premature 
babies, including Hunter.
B. Termination Not Established as a Matter of Law
        There 
is also some evidence that Alyssha terminated the physician-patient relationship 
between Dr. Gross and Hunter.  She did not reschedule the February 28 
appointment that Hunter missed when he was in the hospital with a virus.  
Eventually, in June 1997, Hunter finally obtained an ROP follow-up examination 
with another pediatric ophthalmologist where he was diagnosed as legally 
blind.  But, this one fact—Alyssha’s failure to reschedule the February 
28 appointment after scheduling the February 17 and February 28 
appointments—does not establish termination as a matter of law in light of the 
evidence outlined above supporting the deemed finding of a continued 
physician-patient relationship between Dr. Gross and Hunter.  Because the 
jury could have reasonably concluded from the evidence that the 
physician-patient relationship between Dr. Gross and Hunter continued, 
termination was not conclusively established as a matter of law.  See, 
e.g., Transp. Ins. Co. v. Moriel, 879 S.W.2d 10, 25 (Tex. 1994) (recognizing 
that the test for conclusive evidence is similar to the test for no evidence in 
that the court asks whether reasonable minds could differ about the fact 
determination to be made by the jury).
        The 
trial court here found, and the parties agreed, that a physician-patient 
relationship existed as a matter of law between Dr. Gross and Hunter with 
respect to Hunter’s ROP at the time of the in-hospital examination.  
Based on the record before us, viewing all of the evidence in the light most 
favorable to Hunter and disregarding all contrary evidence and inferences, I 
would hold that the evidence is legally sufficient to support the deemed finding 
that this relationship continued after Dr. Gross’s in-hospital examination of 
Hunter.  I would also hold that the evidence does not conclusively 
establish termination of the physician-patient relationship between Hunter and 
Dr. Gross because reasonable minds can differ on this issue.  I would 
therefore overrule Dr. Gross’s first issue and proceed to address the other 
issues raised by Dr. Gross in this appeal.
C. Legal Sufficiency Review Does Not Result in 
Expanded Duty
        In 
its conclusion concerning Dr. Gross’s appeal, the majority theorizes that to 
hold sufficient evidence exists supporting the deemed finding that the 
physician-patient relationship between Dr. Gross and Hunter continued would 
“expand the duty of continued care to all patients who are seen at hospitals 
by consulting physicians beyond the hospital setting.”  Maj. Op. at 
27.  I must respectfully disagree.  Two main facts remove this case 
from the general category of cases referenced by the majority:  cases where 
a "duty of continued care [would be owed] to all patients who are seen at 
hospitals by consulting physicians beyond the hospital setting.”  Maj. 
Op. at 28.  First, the “Dear Patient” letter approved by Dr. Gross 
specifically labeling him as “your pediatric ophthalmologist” removes this 
case from this general category of cases. Second, the guidelines set by The 
American Academy of Pediatrics, the American Association for Pediatric 
Ophthalmology and Strabismus, and the American Academy of Ophthalmology, and 
recognized by Dr. Gross as constituting the standard of care likewise remove 
this case from this general category of cases referenced by the majority.  
The standard of care requires that infants with ROP, like Hunter, “be seen at 
least every 1 to 2 weeks until normal vascularization proceeds to Zone III or 
the risk of attaining threshold conditions is passed.”  Thus, a pediatric 
ophthalmologist, like Dr. Gross, making a diagnosis of ROP in the hospital knows 
when the diagnosis is made that the standard of care requires very rapid 
follow-up appointments.  A doctor who sees a patient in the hospital, 
diagnoses the patient for a course of treatment, holds himself out in writing as 
the patient’s doctor, recommends follow-up treatment for the patient with 
himself, understands that the standard of care requires immediate follow-up 
treatment, and is said by an expert to be responsible for taking steps to make 
sure the follow-up treatment occurs, is not simply a consulting physician.  
I cannot agree that holding the evidence legally sufficient to support the 
deemed finding of a continued physician-patient relationship between Dr. Gross 
and Hunter would constitute a expansion of the duties imposed on any consulting 
doctor who does not diagnose a patient for a course of treatment, does not hold 
himself out in writing as the patient’s doctor, does not recommend follow-up 
treatment for the patient with himself, and does not admit that the standard of 
care requires that follow-up treatment occurs.
III. Conclusion
        Because 
more than a scintilla of evidence exists supporting the jury’s implied finding 
that Dr. Gross’s physician-patient relationship with Hunter continued after 
Dr. Gross’s in-hospital examination of Hunter, and because the evidence does 
not conclusively establish termination of that relationship, I would overrule 
Dr. Gross’s first issue and proceed to address his remaining issues on 
rehearing en banc.
 
 
                                                          SUE 
WALKER
                                                          JUSTICE
 

  
DELIVERED: 
September 2, 2004


 
COURT OF APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH
 
NO. 2-01-206-CV
  
  
ROBERT 
GROSS, M.D., ALL SAINTS
INTEGRATED 
AFFILIATES D/B/A
ALL 
SAINTS MEDICAL ASSOCIATES,
AND 
STEPHANIE PERDUE, M.D.                                            APPELLANTS
  
V.
   
ALYSSHA 
AND KEITH BURT,
INDIVIDUALLY 
AND AS NEXT
FRIENDS 
FOR HUNTER AND
TYLER 
BURT, MINOR CHILDREN                                              APPELLEES
  
------------
 
FROM 
THE 342ND DISTRICT COURT OF TARRANT COUNTY
 
------------
 
ORDER ON MOTION FOR 
REHEARING AND MOTION FOR
REHEARING EN BANC AS TO 
ALL SAINTS INTEGRATED
AFFILIATES D/B/A ALL 
SAINTS MEDICAL ASSOCIATES AND
STEPHANIE PERDUE, M.D.
 
------------
        We 
have considered appellees’ “Motion for Rehearing and Motion for Rehearing En 
Banc as to All Saints Integrated Affiliates d/b/a All Saints Medical Associates 
and Stephanie Perdue, M.D.”  It is the opinion of the court that said 
motions for rehearing and rehearing en banc should be and are hereby denied.
        The 
clerk of this court is directed to transmit a copy of the order to the attorneys 
of record.
 
        SIGNED September 2, 2004.
   
                                                                                                       
                                                          TERRIE 
LIVINGSTON
                                                          JUSTICE
  
  
EN 
BANC
SAM 
J. DAY, J. (Retired, Sitting by Assignment).
 
DAUPHINOT, 
J. would grant the motion for rehearing en banc.


 
COURT OF APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH
 
NO. 2-01-206-CV
  
  
ROBERT 
GROSS, M.D., ALL SAINTS
INTEGRATED 
AFFILIATES D/B/A
ALL 
SAINTS MEDICAL ASSOCIATES,
AND 
STEPHANIE PERDUE, M.D.                                            APPELLANTS
  
V.
  
ALYSSHA 
AND KEITH BURT,
INDIVIDUALLY 
AND AS NEXT
FRIENDS 
FOR HUNTER AND
TYLER 
BURT, MINOR CHILDREN                                              APPELLEES
  
  
------------
 
FROM 
THE 342ND DISTRICT COURT OF TARRANT COUNTY
 
------------
 
ORDER ON MOTION FOR 
REHEARING AND MOTION FOR
REHEARING EN BANC AS TO 
ROBERT GROSS, M.D.
 
------------
        We 
have considered appellees’ “Motion for Rehearing and Motion for Rehearing En 
Banc as to Robert Gross, M.D.”  It is the opinion of the court that said 
motions for rehearing and rehearing en banc should be and are hereby denied.
        The 
clerk of this court is directed to transmit a copy of the order to the attorneys 
of record.
  
        SIGNED September 2, 2004.
   
                                                                                                       
                                                          TERRIE 
LIVINGSTON
                                                          JUSTICE
  
  
EN 
BANC
SAM 
J. DAY, J. (Retired, Sitting by Assignment).
  
CAYCE, 
C.J.; DAUPHINOT, GARDNER, and WALKER, JJ. would grant the motion for rehearing 
en banc.
 
GARDNER, 
J. filed a dissenting opinion.



COURT OF APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH
 
NO. 2-01-206-CV
 
  
ROBERT 
GROSS, M.D., ALL SAINTS                                      APPELLANTS
INTEGRATED 
AFFILIATE D/B/A
ALL 
SAINTS MEDICAL ASSOCIATES,
AND 
STEPHANIE PERDUE, M.D.
  
V.
  
ALYSSHA 
AND KEITH BURT,                                                   APPELLEES
INDIVIDUALLY 
AND AS NEXT
FRIENDS 
FOR HUNTER AND
TYLER 
BURT, MINOR CHILDREN
  
  
------------
 
FROM 
THE 342ND DISTRICT COURT OF TARRANT COUNTY
 
------------
 
DISSENTING OPINION FROM 
DENIAL OF MOTION FOR
REHEARING EN BANC AS TO 
ROBERT GROSS, M.D.
 
------------
        I 
respectfully dissent from the denial of Appellees’ motion for rehearing en 
banc as to Dr. Gross.  First, I simply believe this case presents an issue 
of extraordinary circumstances requiring an en banc review by this Court.[1]  That issue is whether the physician-patient 
relationship continued during the pertinent time in question after Dr. Gross 
performed the ROP screen on Hunter and provided his report and recommendations 
to Dr. Smith.  This appears to be a case of first impression involving an 
increasingly common issue of the extent of a physician-patient relationship 
arising out of consultation by a specialist in the hospital setting. An 
appellate court in another jurisdiction recently noted “the increasing 
complexity of the managed health care system, in which patients routinely are 
diagnosed by pathologists or radiologists or other consulting physicians” in 
determining whether a physician-patient relationship exists.[2]
        There 
appears to be no reported case involving a disputed issue of whether a 
physician-patient relationship with a consulting or on-call specialist extended beyond 
an examination or treatment in the hospital setting; much less is there a case 
dealing with this issue involving additional factors such as those present 
here.  The importance and novel nature of the issue is underscored by the 
stated reluctance of the panel’s majority opinion to “expand the duty of 
continued care to all patients who are seen at hospitals by consulting 
physicians beyond the hospital setting based solely upon the fact that they were 
seen by the physician in the hospital” because such a holding would create a 
never-ending duty.  See Maj. Op. at 27.  While I agree that the 
sole factor of just seeing a patient as a consulting physician may not be 
enough, this case involves additional factors that should be considered together 
to determine whether the evidence establishes an extended physician-patient 
relationship here.  And I do not believe the majority’s fear is 
well-founded that the creation of a never-ending relationship would be the 
necessary result of holding that a fact issue exists in this case.
        Dr. 
Gross does not dispute that a physician-patient relationship was created with 
Hunter by his agreement with the hospital to act as the consulting pediatric 
ophthalmologist, his participation in the Burts’ managed care plan, and his 
taking of affirmative action to perform the ROP screening on Hunter in the 
hospital. But this case involves more than a single consultation.  This 
case involves also setting up an appointment for a “follow-up” office visit 
with Dr. Gross after Hunter’s discharge, a call from Dr. Gross’s office to 
remind the mother of the appointment and need for a referral, a rescheduling of 
the appointment, setting up a chart on Hunter by Dr. Gross at his office with a 
view toward follow-up visits, and the “Dear Parents” letter that arguably 
refers to Dr. Gross as the pediatric ophthalmologist who was to contact the 
parents regarding any significant finding.
        Additionally, 
recognizing that the evidence raised an issue of fact as to the existence of a 
continuing physician-patient relationship in this case would not create a 
never-ending duty because the context is that of a condition, Stage I ROP, that 
requires follow-ups weekly or every two weeks as mandated by a Joint Statement 
by the American Academies of Pediatrics, Pediatric Ophthalmology and Strabismus, 
and Ophthalmology only during a finite period of time until “threshold” is 
reached and the condition may be successfully treated, or until time for 
development of the condition and risk for untreated blindness passes.
        I 
also believe this court should resolve en banc the issue of who had the burden 
of proof on the issue of the continuation of the physician-patient 
relationship.  The Burts and the dissenting member of the panel urge that 
the issue is one of “termination,” an affirmative defense on which Dr. Gross 
bore the burden of proof and submission.  Dr. Gross, however, contends that 
his physician-patient relationship with Hunter was merely limited in time, 
ending on February 8, 1997, after he had screened Hunter and furnished his 
findings and recommendations to Dr. Smith.  He denies that it continued or 
was extended after Hunter’s discharge.
        A 
plaintiff has the burden to prove four elements in a medical malpractice cause 
of action: (1) a duty owed by the physician to act according to a certain 
standard of care; (2) breach of the applicable standard; (3) injury; and (4) 
proximate cause.[3] The duty normally flows from 
the physician-patient relationship.[4]  
Although duty is a question of law, the predicate existence of facts 
establishing a physician-patient relationship at the time of the breach may be a 
question of fact, and the existence of a physician-patient relationship is 
essential to a plaintiff’s cause of action for medical malpractice.[5]  As such, as stated by Justice Peeples in Rampel 
v. Wascher, it is the patient’s burden to prove the existence of the 
physician-patient relationship in a medical malpractice case when that issue is 
disputed.[6]
        Once 
the initial physician-patient relationship is established, the physician’s 
duty ordinarily extends to treating the patient as long as attention is needed 
or until the patient discharges the doctor or the patient is given reasonable 
notice and an opportunity to secure other medical attention.[7]  Because an initial physician-patient 
relationship was established between Dr. Gross and Hunter while Hunter was still 
in the hospital, it follows that Dr. Gross must accept the duties that flow from 
that relationship.[8]  Indeed, it has been 
held that it is the plaintiff’s burden to request issues establishing that 
termination of a relationship by a physician was negligent or wrongful and 
resulted in damages.[9] In contrast, here the 
only dispute was whether the relationship continued after the screening.  
Thus, it would appear that the correct issue was whether the physician-patient 
relationship existed at the times of the alleged breaches of duty.  I would 
hold with the majority of the panel that the burden was on the Burts to 
establish the continuation of the existence of the physician-patient 
relationship at the time of the alleged breach of duty by Dr. Gross, rather than 
placing the burden on Dr. Gross to establish that the relationship was 
terminated.[10]
        Under 
rule 279, the trial court may make an express finding in support of the judgment 
if a charge was submitted on a cause of action or defense consisting of more 
than one element, if the party with the burden of proof on the cause of 
action did not request a missing element, if the opposing party fails to object 
to the missing element, if the missing element is “necessarily referable” to 
the submitted cause of action or defense, and if there is factually sufficient 
evidence to support the missing element.[11]  
By not objecting, the parties waive a jury finding on the omitted issue, but 
they implicitly agree to submit the issue to the trial court.[12] If the trial court does not make an express 
finding after trial, the appellate court will “deem” the omitted element 
found in support of the judgment if there is legally and factually sufficient 
evidence to support it.[13]  If the 
opposing party objected to the missing element, the element cannot be deemed 
found in support of the judgment, and the absence of a finding forecloses the 
right of recovery or defense on the theory submitted unless the missing element 
is established as a matter of law.[14]
        Because 
the existence of the physician-patient relationship was not requested and there 
was no objection, that element must be “deemed” found in support of the 
judgment unless there was legally or factually insufficient evidence to support 
such a deemed finding.  Both expressly and by virtue of the language of 
that rule, Dr. Gross retained the right to challenge the deemed finding after 
verdict based on legally and factually insufficient evidence.[15] Whether a physician-patient relationship exists is 
particularly fact-driven and is most often held to be a fact issue for the jury 
under the particular facts and circumstances of each case.[16]  For all of these reasons, I would grant the 
motion for rehearing en banc as to Dr. Gross.
 
  
                                                          ANNE 
GARDNER
                                                          JUSTICE
  
  
DELIVERED: 
September 2, 2004


  
NOTES
NOTES TO 
MAJORITY OPINION ON REHEARING
1.  
See separate orders of same date as opinion attached.
2.  
Alyssha and Keith were not married at the time of the twins’ birth. Before 
they married, Alyssha used her last name, Wilson, or her previous married name, 
Taylor. She used Taylor as the last name for the twins in the NICU, but made all 
appointments with Dr. Gross using the name Burt.
3.  
Although she had no previous experience with premature babies, Alyssha had 
worked as a nurse’s aide before giving birth to the twins.
4.  
In the Burts’ letter brief and at oral argument they concede that the Texas 
Supreme Court opinion, Columbia Hospital Corp. v. Moore, prohibits the 
award of prejudgment interest on future damages in health care liability claims. 
92 S.W.3d 470, 474-75 (Tex. 2002). Thus, we sustain Dr. Gross’s fifth issue.
5.  
There is no explanation in the record as to why Keith Burt is referred to as 
Douglas Burt on this form.
6.  
Dr. Gross contended there was no evidence he owed any duty to Hunter.
7.  
There was no need to submit an issue as to Tyler because Dr. Gross had already 
been granted a summary judgment in his favor as to Tyler.
8.  
The Burts' counsel responded that he would not ask Dr. Gross to waive that 
point.
9.  
The discussion of the medical malpractice issue in Day was determinative 
of the main issue in that case: whether the Days’ attorneys committed legal 
malpractice in the underlying medical malpractice case. 961 S.W.2d at 280-81.
10.  
In light of this holding we need not address Dr. Gross's factual insufficiency 
argument or his remaining issues. See Tex. R. App. P. 47.1.
11.  
All doctors testified that an external eye exam is insufficient to detect early 
stages of ROP.
12.  
All Saints and Dr. Perdue also challenge the legal and factual sufficiency of 
the evidence on damages as well; however, because our opinion on causation is 
dispositive, we do not address the portion of their fifth issue complaining 
about the sufficiency of the evidence on damages. See Tex. R. App. P. 47.1.
13.  
Dr. Burke admitted that the heaviest weight of the children in the CRYO-ROP 
study was 1,250 grams; therefore, Hunter barely fell within the weight limits of 
the children studied, and the study was not applicable to Tyler.
14.  
This standard was from the Joint Statement of the American Academy of 
Pediatrics, American Association for Pediatric Ophthalmology, and the American 
Academy of Ophthalmology on Screening Examination of Premature Infants for 
Retinopathy of Prematurity, which Dr. Burke testified was the standard of care 
for ROP screening and treatment at the time of trial.
15.  
Specifically, Dr. Lockhart testified that the twins’ birthweights were 
“fairly high in a group of infants that are premature that are studied and 
examined and treated for” ROP and that “there are two groups . . . in the 
literature. Some of the larger kids take longer to develop retinopathy of 
prematurity of any stage. And there is a subset of a group of bigger kids that 
tend to develop it a little earlier. . . . [I]t falls both ways.”
16.  
Two Dr. Browns testified in this case, Dr. Sandra Brown and Dr. Michael Brown. 
All references in this opinion to “Dr. Brown” are to Dr. Sandra Brown.
17.  
The median represents that point in which half of those infants in a particular 
group had already reached threshold and half had not. Because all of the experts 
agree that there is no way of knowing whether Hunter or Tyler were in the first 
half or second half, the only logical assumption when trying to decide whether 
they had more likely than not (or a fifty percent or greater chance) reached 
threshold is that they reached threshold at the median age for their respective 
birthweights. Because even this assumption is speculative, it casts even further 
doubt on the reliability of Dr. Burke’s challenged opinion regarding the 
success of treatment of the twins’ eyes when Dr. Perdue took over their care.
        The 
Burts claim in their motion for rehearing that our opinion fails to view the 
causation evidence in the light most favorable to them. We cannot, however, 
assume or infer that Hunter reached threshold later than the statistical median 
age for his birthweight group, nor can we assume or infer that Tyler reached 
threshold at a later date because his birthweight group was not even studied. 
Such inferences are not reasonable because they are not supported by the record.
18.  
The Burts contend that All Saints and Dr. Perdue did not preserve error on this 
issue because at trial, their counsel, rather than making his own objection to 
Dr. Burke’s testimony, joined in Dr. Yee’s objection, which incorporated the 
terms of Dr. Yee’s motions to strike and exclude Dr. Burke’s testimony. 
These motions did not raise some of the grounds raised in All Saints and Dr. 
Perdue’s motion to exclude. However, it is clear from the trial judge’s 
response that he understood the joint objections to renew and incorporate all 
previous objections to Dr. Burke’s testimony, including All Saints and Dr. 
Perdue’s prior written motion to exclude. Therefore, the complaint was 
preserved. See Tex. R. App. P. 
33.1(a).
19.  
The term “ipse dixit” means “something asserted but not proved” and is 
literally translated “he himself said it.” Marvelli, 100 S.W.3d at 
478 n.6 (citing Black’s Law Dictionary 
833 (7th ed.1999)).
20.  
Our holding on reliability is limited solely to Dr. Burke’s conclusion that 
the twins still had a better than fifty percent chance of improvement if Dr. 
Perdue had immediately referred them for treatment, notwithstanding the fact 
that the twins had more likely than not reached threshold by March 20, 1997.
21.  
In light of our holding on this issue, we need not address their remaining 
issues. See Tex. R. App. P. 
47.1.
 
NOTES TO DISSENTING OPINION ON REHEARING
1.  I do not believe, however, 
as urged by the opinion dissenting to the denial of en banc rehearing as to Dr. 
Gross, that en banc rehearing is necessary to determine the burden of proof to 
establish termination of or the ending of Dr. Gross’s physician patient 
relationship with Hunter. Dr. Gross bore that burden.
2.  If there is evidence of 
termination of a physician-patient relationship, section 50.6 of the Texas 
Pattern Jury Charges provides that the following may be submitted:

A physician-patient relationship does not exist when either the physician or the 
patient has terminated the relationship. A patient may terminate the 
relationship at any time. The physician may terminate the relationship at any 
time if reasonable provision for adequate medical care is made or if the patient 
is not in need of continuing medical care.
3 Comm. on Pattern Jury Charges, State Bar of 
Tex., Texas Pattern Jury Charges PJC 50.6 (2d ed. 2002).
3.  Dr. Gross testified that, 
after he examined Hunter in the NICU, he recommended follow-up on Hunter because 
Hunter had ROP. Dr. Gross was asked:
  
Q. Dr. Gross, using your definition of the standard of care, do you agree that 
in February of ‘97 the standard of care required that Hunter be followed up by 
a pediatric ophthalmologist because he had a finding of immature retina?
A. 
Yes.
 
Dr. 
Gross testified that he recommended a follow-up exam in two weeks. Alyssha 
scheduled an appointment with Dr. Gross before Hunter left the hospital.
4.  At trial, Dr. Gross denied 
receiving the February 19 referrals for Hunter because “[w]e have no record of 
these referrals ever having been received.” But he was impeached with his 
deposition testimony that it was not safe to assume that the referrals were 
never received simply because the pink referral sheets were not located in his 
office. He testified that “they may have been sent. Referrals are only good 
for 60 days. So they may have been received and discarded after they were 
expired.” Dr. Yee testified that, although he did not remember sending this 
specific referral to Dr. Gross, his usual practice would be to fax or mail the 
referral or to have the patient come pick it up before the appointment.
5.  Thus, both Hunter’s 
referral form from Dr. Yee, which Dr. Gross may or may not have received, and 
Dr. Gross’s own ROP screening form which Dr. Gross himself completed in the 
hospital and provided to his office personnel, showed that Hunter’s parents 
were "[Alyssha] Taylor [and] [Keith] Burt." Viewed in the light 
most favorable to Hunter, there is not an “intervening identification 
issue” with Dr. Gross’s office as to Hunter’s last name as the majority 
contends. Maj. Op. at 24-26. Even Dr. Gross conceded his office should have 
checked under both last names and a reasonable inference exists that a newborn 
will use either his mother’s or his father’s last name.
 
NOTES TO DISSENTING OPINION TO ORDER DENYING REHEARING EN BANC
1.  See Tex. R. App. P. 41.2(c).
2. Kelley v. Middle Tenn. 
Emergency Physicians, P.C., 133 S.W.3d 587, 596 (Tenn. 2004) (holding 
physician-patient relationship could be based upon “implied consent” as to 
consultation by emergency room physician with on-call cardiologist covering for 
patient’s absent treating cardiologist).
3.  Majzoub v. Appling, 
95 S.W.3d 432, 436 (Tex. App.—Houston [1st Dist.] 2002, pet. 
denied) (op. on reh’g); Lection v. Dyll, 65 S.W.3d 696, 703-04 (Tex. 
App.—Dallas 2001, pet. denied) (op. on reh’g).
4.  See St. John v. Pope, 
901 S.W.2d 420, 423 (Tex. 1995); Jackson v. Isaac, 76 S.W.3d 177, 179 
(Tex. App.—Eastland 2002, pet. denied); Lopez v. Aziz, 852 S.W.2d 303, 
305-06 (Tex. App.—San Antonio 1993, no writ); Salas v. Gamboa, 760 
S.W.2d 838, 840 (Tex. App.—San Antonio 1988, no writ) (stating that duty flows 
from relationship).
5.  See St. John, 901 
S.W.2d at 423; Jackson, 76 S.W.3d at 179 (both noting that no duty exists 
absent physician-patient relationship); Lection, 65 S.W.3d at 704 
(stating that physician is liable only where there is physician-patient 
relationship); see also Kelley, 133 S.W.3d at 592 (noting and citing 
cases in which courts have recognized existence of relationship as 
“essential” or “necessary” element of plaintiff’s medical malpractice 
cause of action); accord Weaver v. Univ. of Mich. Bd. of Regents, 
506 N.W.2d 264, 265 (Mich. Ct. App. 1993) (stating that professional 
relationship is “legal prerequisite” to cause of action for medical 
malpractice).
6.  845 S.W.2d 918, 921 
(Tex. App.—San Antonio 1992, writ denied) (citing Wilson v. Winsett, 
828 S.W2d 231, 232 (Tex. App.—Amarillo 1992, writ denied) and Salas, 
760 S.W.2d at 840)).
7.  Lee v. Dewbre, 
362 S.W.2d 900, 902 (Tex. Civ. App.—Amarillo 1962, no writ); Urrita v. 
Patino, 297 S.W. 512, 516 (Tex. Civ. App.—San Antonio 1927, no writ); see 
generally, 1 J. Hadley Edgar, Jr. 
& James B. Sales, Texas Torts & Remedies § 11.01[1][c] (2004).
8.  See Wheeler v. Yettie 
Kersting Mem’l Hosp., 866 S.W.2d 32, 40 (Tex. App.—Houston [1st 
Dist.] 1993, no writ).
9.  Traylor v. Goulding, 
497 S.W.2d 468, 472 (Tex. Civ. App.—Houston [1st Dist.] 1973), rev’d 
on other grounds, 497 S.W.2d 944 (Tex. 1973).
10.  The period in issue is 
the period after the ROP screening of February 8, and after Hunter’s 
discharge, during which Hunter could have been monitored and treated for the 
ROP, at least as testified to by the Burts’ experts. I believe it is clear 
that the Burts terminated any relationship when they decided after the second 
missed appointment with Dr. Gross to seek care from another pediatric 
ophthalmologist. But by that time the window of opportunity had closed.
11.  Tex. R. Civ. P. 279; Gulf States 
Utils. Co. v. Low, 79 S.W.3d 561, 565 (Tex. 2002); Williams v. Olivo, 
952 S.W.2d 523, 529 (Tex. 1997); Wal-Mart Stores, Inc. v. Renteria, 52 
S.W.3d 848, 850 (Tex. App.—San Antonio 2001, pet. denied).
12.  Gulf States, 79 
S.W.2d at 565.
13.  State Farm Life 
Ins. Co. v. Beaston, 907 S.W.2d 430, 437 (Tex. 1995); Ramos v. Frito-Lay, 
Inc., 784 S.W.2d 667, 668 (Tex. 1990).
14.  Olivo, 952 S.W.2d 
at 529; McKinley v. Stripling, 763 S.W.2d 407, 410 (Tex. 1989).
15.  Rule 279 expressly states 
that factually sufficient evidence” is a prerequisite to a deemed finding as 
follows:
[If] 
one or more of such elements are omitted from the charge, without request or 
objection, and there is factually sufficient evidence to support a finding 
thereon . . . . such omitted element or elements shall be deemed found by 
the court in such manner as to support the judgment.
Tex. R. Civ. P. 279 (emphasis added).
16.  See Rampel, 845 
S.W.2d at 920; see also Kelley, 133 S.W.3d at 598 (noting that whether 
physician-patient relationship exists is generally a question of fact in medical 
malpractice cases); Irvin v. Smith, 272 Kan. 112, 31 P.3d 934, 941 (2001) 
(stating whether that relationship exists is generally an issue for jury); See 
generally, James L. Rigelhaupt, Jr., Annotation, What Constitutes 
Physician-Patient Relationship for Malpractice Purposes?, 17 A.L.R. 4th 132 
(1982 & Supp. 2004).